21 P.3d 707 (2001)
143 Wash.2d 469
ALLSTATE INSURANCE COMPANY, Respondent,
v.
Martin E. RAYNOR, individually, as personal representative of the Estate of Cheryl Raynor, and as the guardian ad litem of Kathryn Raynor, a minor; David Johnson, individually and as the personal representative of the estate of Candy Johnson, Petitioners,
Margie E. King, individually; John Doe, as the personal representative of the Estate of Milton R. King; City of Longview, a municipal corporation; County of Cowlitz, a political subdivision of Washington State; Casey Tilton and Jane Doe Tilton, husband and wife, and their marital community; and Tom Homad and Jane Doe Homad, husband and wife, and their marital community, Defendants.
No. 68141-4.
Supreme Court of Washington, En Banc.
Argued May 31, 2000.
Decided April 19, 2001.
*708 Michael McKinstry, Keith Kemper, Thomas Geisness, Robert Clough, Seattle for Petitioners.
R. Daniel Lindahl, Portland, for Respondent.
BRIDGE, J.
Upset over rabbits and rabbit droppings in the property next to his, 72-year-old Milton *709 King fatally shot his neighbor Candy Johnson and her 12-year-old daughter Cheryl Raynor, then immediately committed suicide. Representatives for Candy's surviving 11-year-old daughter Kathryn Raynor and for the estates and family of Candy and Cheryl sought wrongful death compensation from, inter alia, Milton's estate and his widow Margie. As provider of the Kings' homeowners insurance policy, Allstate Insurance Company brought this separate declaratory judgment action, asking the Cowlitz County Superior Court to rule that it was not liable for the losses under the policy terms. The trial court granted Allstate summary judgment. We affirm based on the policy's criminal act exclusion and joint obligations clause.

FACTS
Milton King's .22 caliber handgun had been confiscated in November 1990 after an incident for which he was convicted of second degree assault. His attorney later retrieved the gun from the police, and on July 3, 1992, Milton and his wife Margie drove to the attorney's office, and the attorney gave the firearm to Margie while her husband waited outside.
David and Candy Johnson and Candy's two daughters were the Kings' neighbors in Longview that summer. Their ownership of rabbits deeply upset Milton. On several occasions, he called the Longview Planning and Building Department (Department) about the rabbits and their droppings. On Tuesday, July 7, 1992, he went to the Department to complain in person. When he was not waited on in a timely fashion, he proceeded to the mayor's office. When he was informed that neither the mayor nor the city manager was available to see him, Milton announced he would "just have to take care of this myself," and left. Clerk's Papers (CP) at 715.
That Friday, July 10, 1992, at 8:30 a.m., Milton called the Department to see what, if any, action had been taken to address the rabbit situation. He then went down in person to the Longview police station to ask officers to come and stop his neighbors from raising rabbits. He complained that the rabbits had caused him stress, insomnia, and higher blood pressure. Unable to convince the officers to take any action on his behalf, Milton eventually went home.
Later that same day, Candy, her two daughters, and a friend of the girls began stacking wood near the fence they shared with the Kings. When Milton and Margie began cursing at them, Candy called 911 (i.e., Cowlitz County Communications). Longview Police Officer Casey Tilton responded. After assuring Candy that it was lawful for her to raise rabbits and stack wood on her property, the officer contacted the Kings. Milton insisted Candy was stacking the wood to cover up rabbit droppings as well as simply to harass him. He urged the officer to halt the raising of rabbits. When Officer Tilton declined to intervene, Milton became verbally abusive.
Margie then called 911, which again dispatched Officer Tilton to the scene. After consulting with his superior, though, he decided not to respond. He notified the dispatcher of his decision, reporting that the Kings, whom he described as "elderly, slightly 10-22,"[1] had no valid reason to be upset. CP at 673. Another officer then contacted Officer Tilton to make sure he was aware of King's personal background. "Oh, sure," Officer Tilton responded. "He was acting real strange, 10-22, the whole works." CP at 719. The other officer commented "he's like that all the time." Id. Overhearing the calls, Mary Williamson, a Longview Police Department receptionist, then contacted the 911 dispatcher herself to warn that, based on 30 years as Milton's neighbor and acquaintance, she believed that, absent intervention, he might end up doing something "very violent." CP at 674. She urged that police "at least go out and talk to him." CP at 720. She warned that, given Milton's state of mind, he "wouldn't care if the officers killed him." CP at 674. At 4:19 p.m., the dispatcher called the Kings to tell them the police would not be responding. Margie shouted *710 into the phone, "[T]he cops defend the criminals." CP at 432.
Moments later, Milton armed himself with his .22 caliber handgun and a .38 caliber revolver and went out into his backyard, where he stood watching Candy and the children stacking wood. Margie told her husband it was "not worth it" and was able to persuade him to come back into the house. CP at 48-49. Milton put the guns back into a drawer and lay down. Margie says her elderly husband's heart was beating so fast at that moment that she feared it was "going to pop out of [his] chest." CP at 675. Margie went into the backyard herself and poked a stick through the fence in an effort to knock over the neighbors' woodpile and later turned on a water sprinkler, spraying the girls next door and eliciting a pejorative verbal response from them.
Suddenly, Milton burst from his house and stormed directly onto Candy's property, firing his .22 caliber handgun. Candy was hit once in the mouth, and her daughter Cheryl twice in the chest. Candy and her other daughter Kathryn ran into the house, and the girls' friend fled the scene. Candy called 911 and, despite her mouth wound, was able to inform the dispatcher she had been shot.[2] While Candy was still on the phone with the 911 dispatcher, Milton entered her house and shot her twice more in the chest. Severely wounded, Candy sought refuge in the bathroom with her daughter Kathryn, who hid in the bathtub. Candy pressed her back against the door to prevent Milton from entering. Milton then left the house and fatally shot himself in the head with his .38 caliber revolver. Candy and Cheryl died from their gunshot wounds.
Martin Raynor, appearing individually, as personal representative of his daughter Cheryl's estate, and as his daughter Kathryn's guardian ad litem, together with David Johnson, appearing personally and as personal representative of Candy's estate, filed suit in Clark County Superior Court. They alleged, inter alia, that Milton and Margie King, Officer Tilton, the City of Longview, the County of Cowlitz, and Milton's defense attorney had all behaved negligently and were legally responsible for the wrongful deaths of Candy and Cheryl.
Allstate brought this separate declaratory judgment action to establish that the wrongful deaths and personal injuries were not covered under the Kings' Deluxe Homeowners Policy. The "Family Liability Protection" section of that policy guarantees that "Allstate will pay all sums arising from an accidental loss which an insured person becomes legally obligated to pay as damages because of bodily injury ... covered by this part of the policy." CP at 29 (emphasis omitted). The policy expressly excludes coverage, though, for "any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." CP at 29 (emphasis omitted). The policy also includes a joint obligations clause:
The terms of this policy impose joint obligations on the person named on the declarations page as the Insured and that person's resident spouse. These persons are defined as you or your. This means that the responsibilities, acts and failures to act of a person defined as you or your will be binding upon another person defined as you or your.
CP at 10 (emphasis omitted).
Dr. G. Christian Harris, a board-certified psychiatrist and neurologist, reviewed Milton's history and the circumstances of the shootings and concluded that he was suffering "sufficient impairment in mental functions as to seriously compromise his capacity to formulate intent." CP at 452-53. Dr. Harris believed Milton had a "major mental disorder" that impaired "(a) His ability to really see the consequences of his actions, (b) His ability to perceive his environment accurately, and (c) His ability to choose an alternative course of action." CP at 738-39. In Dr. Harris' judgment, Milton "was unable to form the intent to commit these acts and was unable to control his actions when he embarked *711 on his killing spree." CP at 739. However, Dr. Harris expressed confidence that Milton was not criminally insane under the M'Naghten standard.[3]
The court granted Allstate summary judgment as to Milton's and Margie's acts, and the Court of Appeals affirmed. Allstate Ins. Co. v. Raynor, 93 Wash.App. 484, 969 P.2d 510, 975 P.2d 517, 980 P.2d 765 (1999).

ANALYSIS
Summary judgments are reviewed de novo, with all facts and reasonable inferences therefrom viewed in the light most favorable to the nonmoving party. Clements v. Travelers Indem. Co., 121 Wash.2d 243, 249, 850 P.2d 1298 (1993) (citing Wilson v. Steinbach, 98 Wash.2d 434, 656 P.2d 1030 (1982)). A summary judgment motion may be granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party must prove that no factual dispute exists that might affect a trial's outcome. Grange Ins. Co. v. Brosseau, 113 Wash.2d 91, 103, 776 P.2d 123 (1989). Interpretation of the terms of an insurance policy is a matter of law. Allstate Ins. Co. v. Peasley, 131 Wash.2d 420, 423-24, 932 P.2d 1244 (1997) (plurality opinion).

I
Allstate denies liability under the Kings' homeowners insurance policy for the losses resulting from the shootings in this case, because the policy, inter alia, expressly excludes coverage for "any bodily injury or property damage which may reasonably be expected to result from the ... criminal acts of an insured person." CP at 29 (emphasis changed). "Courts interpret insurance contracts as an average insurance purchaser would understand them and give undefined terms in these contracts their `plain, ordinary, and popular' meaning." Kish v. Ins. Co. of N. Am., 125 Wash.2d 164, 170, 883 P.2d 308 (1994) (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 881, 784 P.2d 507 (1990)).[4]
In this state, legal technical meanings have never trumped the common perception of the common man. "[T]he proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract" but instead "whether the insurance policy contract would be meaningful to the [layperson]...". Dairyland Ins. Co. v. Ward, 83 Wash.2d 353, 358, 517 P.2d 966 (1974). "The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average [person], rather than in a technical sense."
Boeing, 113 Wash.2d at 881, 784 P.2d 507.
In Allstate Insurance Co. v. Peasley, James Peasley discharged a firearm, injuring Ardis Parker, a guest in his house. 131 Wash.2d at 423, 932 P.2d 1244. Both Peasley and Parker insisted the nonfatal shooting *712 was accidental. Criminal charges were filed against Peasley, though, and he ultimately pleaded guilty to the crime of second degree reckless endangerment in exchange for the prosecutor's recommendation of a suspended sentence. Id.
A majority of Justices held that Peasley's admitted act of recklessly discharging a firearm in a manner that caused a substantial risk of bodily harm or death to another person triggered the "criminal acts" exclusion in his Allstate insurance policy.[5] A different majority in Peasley held that the controlling standard was the one we set forth in Van Riper v. Constitutional Government League, 1 Wash.2d 635, 96 P.2d 588 (1939).[6] There, we held that a criminal act exclusion does not apply to all acts technically classified as crimes, but only to serious criminal conduct "done with malicious intent, from evil nature, or with a wrongful disposition to harm or injure other persons or property." Id. at 642, 96 P.2d 588.[7] We apply the Van Riper standard here.
The record is unequivocal that Milton was able to perceive the nature and quality of his actionsi.e., pointing a loaded firearm directly at Candy and Cheryl and repeatedly pulling the trigger at close rangeand that he was able to understand the wrongfulness of those actions. Thus, whether or not he was suffering diminished mental capacity at the time, Milton clearly engaged in serious criminal conduct done with, at the very least, "a wrongful disposition to harm or injure other persons." Van Riper, 1 Wash.2d at 642, 96 P.2d 588.[8] We hold that the average insurance purchaser would reasonably apply the policy's criminal act exclusion to Milton's conduct. Allstate is thus not contractually obligated to afford liability protection for the resulting losses.[9]

*713 II
Petitioners argue, however, that the trial court erred in granting summary judgment at least concerning Margie's liability protection. They claim the record allows a reasonable inference that the losses' "efficient proximate cause" was not actually Milton's criminal acts of shooting, but prior, noncriminal negligence on Margie's part. They maintain that a reasonable fact finder could find that Margie's conduct set off a domino-like chain reaction of causal links ending in her 72-year-old spouse having a homicidal mental breakdown. The shootings might never have occurred, they contend, had Margie not provoked her neighbors by poking at their woodpile and then spraying them with water, prompting name-calling from them just moments after her excited husband had been dissuaded from carrying out violent action against them with two deadly weapons.
We first judicially adopted the so-called "efficient proximate cause rule" in 1983:
Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought, the insured peril is regarded as the "proximate cause" of the entire loss.
It is the efficient or predominant cause which sets into motion the chain of events producing the loss which is regarded as the proximate cause, not necessarily the last act in a chain of events.
Graham v. Pub. Employees Mut. Ins. Co., 98 Wash.2d 533, 538, 656 P.2d 1077 (1983). In Villella v. Public Employees Mutual Insurance Co., 106 Wash.2d 806, 815, 725 P.2d 957 (1986), two different events were arguably proximate causes of damage to a house's foundation: (1) builder negligence in failing to install a proper drainage system (a peril covered under the homeowners insurance policy); and (2) "earth movement" (a peril excluded from coverage). 106 Wash.2d at 809, 725 P.2d 957. We held that "where an insured risk itself sets into operation a chain of causation in which the last step may have been an excepted risk, the excepted risk will not defeat recovery." 106 Wash.2d at 815, 725 P.2d 957.[10]
To counter that argument, Allstate invokes the policy's joint obligations clause: "[T]he responsibilities, acts and failures to act of a person defined as you or your will be binding upon another person defined as you or your." CP at 10 (emphasis changed).[11] Milton and his "resident spouse" Margie are clearly defined as "you" and "your." CP at 9. Thus, to the extent that liability protection for petitioners' losses is forfeited under the terms of the policy by Milton's acts of shooting, Margie also loses liability protection for those same losses, Allstate argues. We agree.
The joint obligations clause differs from other types of coverage restrictions, because it does not limit coverage for a particular event, but rather forges the various parties insured by a policy into a joint and inseparable legal entity. Thus, when the conduct of one insured defeats liability protection for a given loss, the policy deprives all other insureds of liability protection for that loss, even if the loss was also proximately caused by one of those parties. See Farmers Ins. Co. v. Hembree, 54 Wash.App. 195, 200-02, 773 P.2d 105 (1989) (exclusion of liability coverage triggered by sexual assault of two children being baby-sat by three insured *714 boys deprived boys' insured parents of coverage for negligent failure to supervise) (citing Farmers Ins. Co. v. Edie, 52 Wash. App. 411, 763 P.2d 454 (1988); U.S.F. & G. Ins. Co. v. Brannan, 22 Wash.App. 341, 589 P.2d 817 (1979)). Since, as discussed above, the shooting deaths of Candy and Cheryl and related losses were the reasonably expected results of "criminal acts of an insured person," such acts forfeited not only Milton's liability protection under the policy for those losses, but, under the joint obligations clause, Margie's liability protection for those same losses as well. Thus, the efficient proximate cause rule is unavailing here.

CONCLUSION
We conclude that petitioners' losses are not covered under the terms of the Kings' Allstate Deluxe Homeowners Policy. We affirm and remand to the trial court for entry of a judgment consistent with this opinion.
ALEXANDER, C.J., SANDERS, SMITH, IRELAND, JOHNSON, MADSEN, JJ., and GUY, J.P.T., concur.
TALMADGE, J.P.T.[*] (concurring).
I concur because the majority arrived at the correct result, but its analytical approach to the coverage for Milton King's conduct creates a potential for future misinterpretations of the law on accident and criminal conduct. No average purchaser of liability insurance would be confused by the issues in this case. Milton King committed a heinous criminal act and did so volitionally. There is no coverage under the Kings' homeowners liability insurance policy.
The insuring clause of a liability insurance policy is the starting place for any coverage discussion. Allstate Insurance Co. (Allstate) agreed to cover the Kings for accidents:

Losses We Cover. Allstate will pay all sums arising from an accidental loss which an insured person becomes legally obligated to pay as damages because of bodily injury ... covered by this part of the policy.
Clerk's Papers at 340. While the policy did not define "accidental loss," "accident" has a very specific meaning in Washington's insurance law. An accident is generally an event unexpected from the standpoint of the insured. See, e.g., Detweiler v. J.C. Penney Ins., 110 Wash.2d 99, 104, 751 P.2d 282 (1988). In Grange Insurance Co. v. Brosseau, 113 Wash.2d 91, 96, 776 P.2d 123 (1989), we described an accident as an event that is unexpected, independent, and unforeseen. This analysis is an objective one: could any reasonable person reach the conclusion that the harm was the unforeseen result of the insured's acts? See Detweiler, 110 Wash.2d at 108, 751 P.2d 282.
This discussion has its roots in the very essence of a liability policy. A policy of liability insurance covers fortuities. As distinct from an indemnity policy that covers all situations within the policy's terms, a liability policy does not afford coverage in the absence of an accident or an "occurrence." See Truck Ins. Ex. v. Rohde, 49 Wash.2d 465, 477, 303 P.2d 659 (1956) (Rosellini, J., dissenting).
To emphasize the policy provides coverage only for fortuitous events, Allstate's policy in this case had two express exclusions that must be read in pari materia. The policy excluded coverage for bodily injuries "which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." Clerk's Papers at 340.
With respect to the criminal acts exclusion, there is no question but that Milton King committed criminal acts. He killed his neighbor Candy Johnson and her daughter Cheryl Raynor before killing himself. In Allstate Insurance Company v. Peasley, 131 Wash.2d 420, 932 P.2d 1244 (1997), we upheld the enforceability of such an exclusion in a homeowners liability policy. We noted there that such an exclusion was not limited to intentional crimes. See also Cary v. Allstate Ins. Co., 130 Wash.2d 335, 922 P.2d 1335 (1996) (exclusion for criminal acts or situations *715 where person found not guilty by reason of insanity).
The principal problem with the majority's analysis is its decision to rewrite the express policy language to transform an exclusion for the insured's "criminal acts" to one for the insured's "serious criminal acts," citing Van Riper v. Constitutional Government League, 1 Wash.2d 635, 96 P.2d 588 (1939). Majority at 712. Apart from the fact the policy language does not so state, the majority injects uncertainty into this area of law. Does the majority mean to say only those crimes described as "serious" or "most serious" in RCW 9.41.010(12) and RCW 9.94A.030(25) are excluded? Or does the majority intend the courts to decide this issue anew in each case? The majority simply fails to demonstrate that the term "criminal acts," as set forth in the Allstate policy, is somehow ambiguous or violative of public policy so that it is not enforceable as written.
The plaintiffs contend any criminal acts exclusion is inapplicable because Milton King could not form the necessary intent to commit a crime. As the majority correctly discerns, Milton King was not insane at the time he committed these crimes. To establish insanity, RCW 9A.12.010(1) requires:
(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
(a) He was unable to perceive the nature and quality of the act with which he is charged; or
(b) He was unable to tell right from wrong with reference to the particular act charged.
Even the plaintiff's expert, Dr. G. Christian Harris, who had never treated or met Milton King, did not testify King was insane:
Raynor's expert witness, Dr. G. Christian Harris, indicated that he "would not go so far as to say that [Milton] didn't understand the general nature of his acts" and that he saw "nothing in the record to indicate that [Milton] wouldn't have a basic idea of what was right and what was wrong." Furthermore, there was no evidence in the record "that suggested delusional thinking, hallucinatory deficits that would ordinarily be necessary to sustain a feeling that the person was disturbed to the extent that he couldn't understand the wrongfulness of his actions" or that Milton suffered from "a psychotic illness that would remove him from understanding the nature of his act or its wrongfulness."
Allstate Ins. Co. v. Raynor, 93 Wash.App. 484, 494, 969 P.2d 510, 975 P.2d 517, 980 P.2d 765 (1999).
As the majority notes, even if King were able to prove diminished capacity in the criminal setting were he alive and charged with a crime, such a defense might be successful in forestalling his conviction for premeditated murder, but not lesser included offenses of homicide such as manslaughter. See, e.g., State v. Eakins, 127 Wash.2d 490, 902 P.2d 1236 (1995); State v. Ellis, 136 Wash.2d 498, 963 P.2d 843 (1998). Indeed, as we noted explicitly in State v. Coates, 107 Wash.2d 882, 735 P.2d 64 (1987), a condition of diminished capacity is not a valid defense to a crime based on criminal negligence. In this case, King could have been convicted of murder in the second degree, or manslaughter, based on a diminished capacity argument. But in either instance, a crime was committed and the policy's exclusion for criminal acts applies.
Turning next to the intentional acts exclusion, the plain import of Allstate's intentional acts exclusion is that no coverage is available if the injury was the reasonably expected result of the insured's intentional act or if the insured in fact intended to cause the injury. For either of these aspects of the exclusion, the insured must intend the act which caused the injury. Taking Dr. Harris' testimony at its most favorable to King, there is no support in his testimony for the view King acted under delusion. He did not believe he was using a toy gun to shoot at cardboard cutouts. He knew he was using a real gun to shoot real bullets at real people. He acted volitionally. As such, King's acts fell within the policy's intentional act exclusion. See N.Y. Underwriters Ins. Co. v. Doty, 58 Wash. App. 546, 794 P.2d 521 (1990).
The events in this case are tragic, given the loss of three lives over a minor neighborhood *716 dispute. That a man of Milton King's disposition had a firearm is very difficult to understand; he should never have had the weapon. But whether a homeowners liability insurance policy provides coverage for an insured's homicidal rage is entirely a different issue. It does not because such conduct is not an accidentthe conduct is intentional or criminal, as I expect nearly all average reasonable purchasers of liability insurance would understand.
NOTES
[1] "10-22" is the Longview Police Department's code for persons engaged in conduct suggestive of a mental disorder. CP at 673.
[2] This call was received at 4:40 p.m., 21 minutes after the Kings were informed the police would not be responding.
[3] Washington's criminal insanity standard is codified at RCW 9A.12.010(1):

At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
(a) He was unable to perceive the nature and quality of the act with which he is charged; or
(b) He was unable to tell right from wrong with reference to the particular act charged.
It was formulated more than a century and a half ago by the House of Lords in the M'Naghten's Case, 10 Clark & Fin. 200, 210, 8 Eng. Rep. 718, 722 (H.L. 1843).
[4] Petitioners argue that a criminal act exclusion applies only to acts resulting in convictions. They note that the criminal act exclusion in Allstate's policy in Cary v. Allstate Insurance Co., 130 Wash.2d 335, 922 P.2d 1335 (1996), was far clearer on this point and argue that the exclusion here, by contrast, is fairly susceptible to two different but reasonable interpretations, and is therefore ambiguous. Wash. Pub. Util. Dists.' Utils. Sys. v. PUD No. 1, 112 Wash.2d 1, 11, 771 P.2d 701 (1989). We have held that ambiguities are strictly construed against the insurer as the drafter of the contractual language, a rule that "applies with added force to exclusionary clauses which seek to limit policy coverage," Findlay v. United Pac. Ins. Co., 129 Wash.2d 368, 374, 917 P.2d 116 (1996), because "exclusions from coverage of insurance are contrary to the fundamental protective purpose of insurance." Stuart v. Am. States Ins. Co., 134 Wash.2d 814, 818-19, 953 P.2d 462 (1998). Petitioner's argument, however, lacks merit. No reasonable insurance purchaser would consider a criminal act somehow less criminal simply because a suicide or some other circumstance prevented its prosecution in a court of law.
[5] See Peasley, 131 Wash.2d at 429, 932 P.2d 1244; id. at 437, 932 P.2d 1244 (Madsen, J., concurring). Four justices signed the Court's plurality opinion, and Justices Guy and Alexander signed Justice Madsen's concurrence. This majority also rejected Peasley's claim that the phrase "criminal acts" was ambiguous or that it exclusively denotes intentional criminal acts. Id. at 429, 932 P.2d 1244; id. at 433, 932 P.2d 1244 (Madsen, J., concurring).
[6] See Peasley, 131 Wash.2d at 433, 932 P.2d 1244 (Madsen, J., concurring) ("However, I must disagree with the majority insofar as it suggests that any and all criminal acts are encompassed by the exclusion and insofar as it fails to follow the still sound analysis in [Van Riper]."); id. at 437, 932 P.2d 1244 (Johnson, J., dissenting) ("I agree with Justice Madsen's conclusion that our holding in [Van Riper] is applicable in this case.").
[7] William Edmund Van Riper died in an automobile accident after running a stop sign and entering an intersection at an excessive speedacts classified as criminal misdemeanors. Van Riper, 1 Wash.2d at 637-38, 96 P.2d 588. Death benefits claimed by his wife and three daughters, who survived the accident, were denied based on the certificate's exclusion of benefits in cases of "`death due to acts committed in criminal violation of law[.]'" Id. (emphasis omitted). However, we held:

To say that a layman ... would apply the word "criminal" to the act of one who, under the circumstances here present, exceeded a speed limit or failed to stop before entering an arterial highway, is either to ignore the common usage of the term or else to imply that practically everyone who has ever driven an automobile is a criminal.
We believe that the word "criminal," as used in the [death benefit] certificate, was meant to signify an act done with malicious intent, from evil nature, or with a wrongful disposition to harm or injure other persons or property. Certainly, none of these obliquities could be ascribed to Mr. Van Riper, who had in his charge, upon the particular occasion, his wife and daughters.
Van Riper, 1 Wash.2d at 642, 96 P.2d 588.
[8] Milton's actions were clearly no less serious or criminal than Peasley's actions. Cf. Peasley, 131 Wash.2d at 428, 932 P.2d 1244; id. at 436, 932 P.2d 1244 (Madsen, J., concurring); id. at 438, 932 P.2d 1244 (Johnson, J., dissenting). Even if Milton was in fact suffering diminished mental capacity at the time of the shooting, we conclude that the lay average insurance purchaser would consider a double homicide committed by a sane person under the circumstances of this case to qualify as a "serious crime." Even in a technical sense, his actions clearly contained all the elements of several crimes, including second degree manslaughter, defined in RCW 9A.32.070 as "caus[ing] the death of another person" with "criminal negligence," see RCW 9A.08.010(1)(d)a charge against which evidence of diminished mental capacity we have held to be unavailing as a defense. See State v. Coates, 107 Wash.2d 882, 892, 735 P.2d 64 (1987); State v. Warden, 80 Wash.App. 448, 456, 909 P.2d 941 (1996), aff'd, 133 Wash.2d 559, 947 P.2d 708 (1997).
[9] We therefore do not reach the question whether the Court of Appeals correctly interpreted and applied the policy's "accidental loss" limitation or "intentional acts" exclusion to the facts presented in this record. See Allstate Ins. Co. v. Raynor, 93 Wash.App. at 492-95, 496-97, 969 P.2d 510; cf. Public Employees Mut. Ins. Co. v. Fitzgerald, 65 Wash.App. 307, 315-16, 828 P.2d 63 (1992) (citing State Farm Fire & Cas. Co. v. Wicka, 474 N.W.2d 324, 331 (Minn. 1991)).
[10] Determining which event constitutes the "efficient proximate cause" of a given loss is normally a question of fact for the jury, and "it is only when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion that it may be a question of law for the court." Graham, 98 Wash.2d at 539, 656 P.2d 1077.
[11] Joint obligations clauses have been deemed valid in other jurisdictions; see, e.g., Castro v. Allstate Ins. Co., 855 F.Supp. 1152, 1155 (S.D.Cal.1994); Allstate Ins. Co. v. Steele, 74 F.3d 878, 881 (8th Cir.1996); and the parties here failed to present a compelling reason for us to find that it violates a recognized public policy. Raynor, 93 Wash.App. at 499-500, 969 P.2d 510.
[*] Justice Philip Talmadge is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend.38).