[No. 24965-4-III.   Division Three.   January 4, 2007.]

NATIONWIDE MUTUAL INSURANCE COMPANY, *Appellant*, v.
HAYLES, INC., ET AL., *Respondents*.

*Michael G. Brady*, for appellant.
*Diehl R. Rettig*, for respondents.

¶1 Schultheis, J. — Hayles, Inc., subleased a Franklin County field to Clemente and Rosalva Ezquivel to grow onions. Under the terms of the sublease, Hayles was to maintain and control the field's irrigation system and the Ezquivels would direct Hayles when to turn the water on and off. When Hayles turned on the water after the Ezquivels told a Hayles employee to keep the water off, the onions rotted. The Ezquivels sued Hayles and the parties settled, with the Ezquivels agreeing to execute on the judgment against Hayles's insurer, Nationwide Mutual Insurance Company.

¶2 Nationwide filed an action for declaratory judgment against Hayles, disclaiming coverage under the policy. On cross motions for summary judgment, Hayles prevailed. Nationwide appeals, contending the damage to the onions was not an "occurrence" as defined by the policy and, even if it was an occurrence, several exclusions apply. We conclude that Hayles's unauthorized act of irrigation was an occurrence covered by the policy. Further finding that no exclusion applies, we affirm.

### Facts

¶3 In February 2003, the Ezquivels subleased a 110-acre field from Hayles (which leased the field from brothers Scott and Terri Hayles). As landlord, Hayles retained control over the irrigation system already installed in the field and agreed to turn the irrigation system on and off whenever the Ezquivels requested. Sometime in late summer 2003, the Ezquivels told Bartolo Herrera, a Hayles employee, to stop irrigating so the onions could dry in the field before harvest. Later, after the onion crop had matured and dried, Mr. Herrera's supervisor, Scott Hayles, turned on the irri-

gation again. The soaked onions developed rot, causing substantial crop loss.

¶4 Nationwide had issued a farm liability insurance policy to Hayles in July 2003 with property damage liability coverage up to $1 million per occurrence. An additional excess liability policy provided $5 million in property liability coverage, and a "protection plus" endorsement added property damage coverage of up to $50,000 for accidents not covered by the other policies. Clerk's Papers (CP) at 847, 856.

¶5 The Ezquivels filed a suit for damages due to breach of contract and negligence against Hayles in December 2003. Nationwide agreed to provide counsel for the defense under a reservation of its right to contest coverage. Just before the date set for trial, the parties entered into a mediated settlement agreement in which they stipulated that the Ezquivels would take judgment against Hayles for $424,157 and would not execute on the judgment except against Nationwide. The stipulated judgment was signed by the parties and filed on March 28, 2005. In June 2005, Nationwide sent the Ezquivels a check for $49,500, representing uncontested coverage under the protection plus endorsement.

¶6 Nationwide then moved to intervene and to request a hearing on the reasonableness of the settlement agreement under RCW 4.22.060. The motion was granted and the hearing was held in June 2005. After considering the arguments of both parties, the superior court concluded that the negotiated settlement was reasonable. Nationwide's timely appeal of this decision was the subject of *Ezquivel v. Hales, Inc.*, noted at 136 Wn. App. 1002, 2006 Wash. App. LEXIS 2479, wherein this court concluded that the trial court did not err in upholding the settlement agreement.

¶7 In October 2004, Nationwide filed a complaint for declaratory judgment against Hayles, alleging that neither its farm policy nor its excess policy provided liability coverage for the rotted onions. In an amended complaint,

Nationwide added the Ezquivels and their company (J&C Contracting, LLC) as defendants. In its answer to the complaint, Hayles asserted a counterclaim that Nationwide acted in bad faith. This counterclaim was later voluntarily dismissed. The parties filed cross motions for summary judgment. After a hearing, the trial court granted Hayles's motion for summary judgment and denied Nationwide's, awarding Hayles attorney fees.

WHETHER INJURY TO THE ONIONS WAS AN "OCCURRENCE"

¶8 Nationwide contends the trial court erred in concluding that the farm policy (including the excess liability policy and the protection plus endorsement) covered the damage to the Ezquivels' onion crop. It argues that the rotted onions were not caused by an "occurrence" under the terms of the policy and that, at any rate, several exclusions deny coverage.

¶9 Interpretation of an insurance contract is a question of law reviewed de novo. *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 682, 801 P.2d 207 (1990), *overruled in part on other grounds by Butzberger v. Foster*, 151 Wn.2d 396, 89 P.3d 689 (2004). This court construes the insurance policy as a whole and gives it a fair and reasonable construction that would be understood by the average person buying insurance. *Panorama Vill. Condo. Owners Ass'n Bd. v. Allstate Ins. Co.*, 144 Wn.2d 130, 137, 26 P.3d 910 (2001); *Cle Elum Bowl, Inc. v. N. Pac. Ins. Co.*, 96 Wn. App. 698, 702, 981 P.2d 872 (1999). Because this is a review of a summary judgment, the facts and reasonable inferences are viewed in the light most favorable to Nationwide. *Allstate Ins. Co. v. Raynor*, 143 Wn.2d 469, 475, 21 P.3d 707 (2001). Summary judgment was appropriate if there was no genuine issue of material fact and Hayles was entitled to judgment as a matter of law. *Id.*

¶10 Nationwide first challenges the trial court's determination that the damage to the onions was a covered event. The policy states that its coverage applies to prop-

erty damage only if the property damage "is caused by an 'occurrence' that takes place in the 'coverage territory.' " CP at 782. "Coverage territory" includes the United States. *Id.* at 801. "Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 804. "Accident" is not defined in the policy.

¶11 Generally, the terms defined in a policy are interpreted as written. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998). Undefined terms are given their ordinary, popular meaning as provided in a standard English language dictionary. *Panorama Vill.*, 144 Wn.2d at 139. Because use of the word "accident" is standard in insurance policy definitions of "occurrence," Washington courts faced with this undefined term have generally agreed that an accident is commonly understood to mean an unintended, unexpected event. *See, e.g., Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 401, 823 P.2d 499 (1992), and cases cited in *Cle Elum Bowl*, 96 Wn. App. at 703-04. Indeed, the Nationwide policy specifically excludes property damage that is "expected or intended by the insured," even if that damage is "of a different kind, quality or degree than initially expected or intended," or is "sustained by a different person, organization, real property or personal property than that initially expected or intended." CP at 783.

¶12 Citing *Roller*, 115 Wn.2d at 685, Nationwide contends an intentional act—such as turning on an irrigation system—can never be an accident. *Roller* does state that "an intentional act cannot, by definition, be an accident." *Id.* at 683. But the court equates "intentional" with "deliberate." *Id.* at 684. In *Roller*, a passenger in a car that had underinsured motorist coverage was injured when an uninsured motorist rammed the passenger's car and later ran over the passenger. The underinsured motorist coverage provided that bodily injury must be caused by accident. *Id.* at 683. On review of the insurer's denial of coverage, our Supreme Court held that the intentional act of the uninsured motorist in ramming the insured

car was not an "accident." *Id.* at 685. By use of the term "intentional," however, *Roller* does not mean that an accident must be caused by an unconscious, nonvolitional act. To prove that an intentional act was not an accident, the insurer must show that it was deliberate, meaning done with awareness of the implications or consequences of the act. *See Detweiler v. J.C. Penney Cas. Ins. Co.*, 110 Wn.2d 99, 104, 751 P.2d 282 (1988) (a deliberate act is not an accident).

¶13 For instance, in *Butler*, 118 Wn.2d at 386-87, an insured fired a gun at a truck carrying young men who had just destroyed the insured's mailbox. One of the young men was injured by a ricocheting bullet. The insurance company denied coverage under a homeowners policy because the injuries did not result from an "accident." *Id.* at 387. Although the insured admitted he intentionally fired his gun at the truck, he argued that the injuries were unintentional and that the ricochet was unexpected. But the record showed that the insured had extensive training with the use of firearms. Concluding that a reasonable person under these circumstances would have been aware that a ricochet was possible and foreseeable, our Supreme Court held that the injury was not the result of an accident. *Id.* at 401.

¶14 Intentional, wrongful acts will not qualify as accidents or "occurrences" if the results could have been expected from the acts. *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 906, 726 P.2d 439 (1986). A negligent act also may constitute an "occurrence" as long as it results in unintended consequences. *Palouse Seed Co. v. Aetna Ins. Co.*, 40 Wn. App. 119, 122, 697 P.2d 593 (1985). Here, the trial court at the reasonableness hearing found that Scott Hayles's intentional act of turning on the irrigation system was either negligent or a breach of his duty to wait until directed to turn on the water by the Ezquivels. The court did not specifically find whether or not Mr. Hayles expected the consequences of his action but noted that he testified he did not notice the condition of the crop when he turned on the water.

¶15 Although Mr. Hayles's awareness of the consequences of his intentional act is a question of fact, summary judgment is appropriate if there is no substantial evidence to sustain a verdict for Nationwide. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). Viewed in the light most favorable to Nationwide, the record provides no evidence that Mr. Hayles knew or should have known that turning on the irrigation system would damage the onion crop. He had no duty to observe the crop and had no authority to decide when the crop needed water or when it needed to be dry. Reasonable minds could conclude only that no one under these circumstances would have anticipated that turning on the water could rot the onions. *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985) (issues of fact on summary judgment). Accordingly, Hayles's unauthorized act of turning on the irrigation, although intentional, was not deliberate. Because the act constituted an occurrence that caused property damage in the coverage territory, it is covered by the farm policy unless it is subject to an exclusion.

## COVERAGE EXCLUSIONS

¶16 Nationwide next contends that, even if the damage to the onions was an occurrence, several exclusions in the farm policy prevent coverage. Most of these exclusions are for damages to personal or real property under the management or control of the insured. Exclusions from insurance coverage "are contrary to the fundamental protective purpose of insurance and will not be extended beyond their clear and unequivocal meaning." *Stuart v. Am. States Ins. Co.*, 134 Wn.2d 814, 818-19, 953 P.2d 462 (1998). This court construes exclusions strictly against the insurer. *Id.* at 819.

¶17 I. Exclusion for care, custody, or control. The farm policy excludes coverage for damage to personal property "in the care, custody or control of the insured." CP at 789. Nationwide contends Hayles had contractual duties to

care for and control the onion crop by controlling the irrigation system. But control over the irrigation system is not control over the onions. Hayles's only relevant duties under the sublease were to maintain the condition of the irrigation system and to turn the water on and off when requested by the Ezquivels.

¶18 *Cashmere Pioneer Growers, Inc. v. Unigard Security Insurance Co.*, 77 Wn. App. 436, 891 P.2d 732 (1995), cited by Nationwide, is inapposite. In *Cashmere*, an apple packing company delivered apples to Cashmere Pioneer Growers, Inc., for storage at controlled temperatures around 32 degrees Fahrenheit. When the apples froze and were ruined, the packing company sought coverage under Cashmere's general liability insurance, which contained an exclusion for damage to personal property in Cashmere's care, custody, or control. *Id.* at 437. This court agreed with the trial court that the apples had been placed in Cashmere's care, custody, or control under the storage contract. *Id.* at 439-40. Cashmere not only stored the apples but agreed to care for them in a particular manner, in an atmosphere with a specified temperature and chemical composition. *Id.* at 440.

¶19 Here, however, Hayles had no contractual duties to care for the onions in a particular manner. The irrigation circle set up in the onion field was, in effect, a permanent structure that Hayles merely turned on and turned off under the orders of the Ezquivels. At no time did the Ezquivels leave Hayles in charge of the onions and did not require Hayles to determine when watering the crop was advisable. Under the clear, unambiguous terms of the exclusion, Hayles did not have care, custody, or control over the onion crop.

■ ■ ¶20 II. Exclusion for operations on real property. Coverage is also excluded for damage to "[t]hat particular part of real property on which you . . . are performing operations, if the 'property damage' arises out of those operations." CP at 789. Neither "operations" nor "real property" are defined in the policy and are therefore given their

ordinary meanings as understood by the average person buying insurance. *Panorama Vill.*, 144 Wn.2d at 137, 139.

¶21 Rather than discuss what the average insurance buyer would consider to be real property, Nationwide contends Washington law has established that growing crops are real property until they are harvested. *In re Estate of Machlied*, 60 Wn.2d 354, 360, 374 P.2d 164 (1962) (the right to possess land is accompanied by ownership of the unsevered crops growing on the land). Hayles also ignores the ordinary meaning of real property and argues that the definition in the Uniform Commercial Code of growing crops as "goods," RCW 62A.2-105(1), controls. Neither party applies the proper test. *See Prosser Comm'n Co. v. Guar. Nat'l Ins. Co.*, 41 Wn. App. 425, 429, 700 P.2d 1188 (1985) (reference to the Uniform Commercial Code and case law is not helpful because insurance contracts are not defined according to definitions established by legal scholars, but according to interpretations given by the average person buying insurance).

¶22 The average insured person would understand that this exclusion denies coverage for *land* damaged by the insured's "operations." "Operations" commonly means "the operating of or putting and maintaining in action of something (as a machine or an industry)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1993). An onion is not the same thing as the soil it is grown in. The Ezquivels did not seek damages for injury to the land they subleased from Hayles, but for the destruction of their onion crop. The exclusion in the farm policy for damage to real property on which Hayles was performing operations does not apply to these facts.

¶23 III. Exclusion for business pursuits. Another exclusion in the farm policy denies coverage for property damage "arising out of or in connection with a 'business' engaged in by an insured. This exclusion applies but is not limited to an act or omission . . . involving a service or duty rendered, promised, owed, or implied to be provided because of the

nature of the 'business.' " CP at 788. "Business" is defined in the policy as a "full-time or part-time trade, profession, occupation or commercial enterprise or activity for profit," but "does not include 'farming.'" *Id.* at 801. "Farming" is further defined as "the operation of an agricultural or aquacultural enterprise." *Id.* at 802.

¶24 Nationwide contends Scott Hayles was not engaged in farming when he operated the irrigation system, but was engaged in the business of subleasing the property for profit. Hayles responds that the Nationwide policy was issued to cover its farming operations on several parcels of land, including the field subleased to the Ezquivels. According to an affidavit filed by Terri Hayles, his company is an agricultural enterprise that rotates its production by leasing fields to potato or onion growers for one year. After that year, Hayles replants the field in alfalfa or other rotational crops. He explains that this is standard farming practice in the Columbia basin area and concludes with a denial that he is in the business of subleasing:

> 2. Hayles, Inc. is not and has not been in the business of buying or leasing property for re-sale or sub-lease. The property it leases is for the purpose of agricultural production, including the occasional rotation into crops that it does not ordinary [sic] produce in furtherance of sound agricultural crop rotation practices.
>
> 3. Crop rotation is a sound cultural practice of farming for the primary purpose of mitigating against the build-up [of] crop specific insects and diseases.

*Id.* at 371. Finding that the sublease to the Ezquivels was part of Hayles's "normal rotation process," the trial court concluded that Hayles was engaged in farming, and not a "business enterprise," when it caused injury to the onions. Report of Proceedings at 65.

¶25 The "plain, ordinary and popular" meaning of "business pursuit" is a profit-motivated activity that is conducted on a regular and continuous basis for the insured's livelihood. *Stuart*, 134 Wn.2d at 822. By all accounts, Hayles was not engaged in subleasing its fields on a continuous basis.

Any sublease was for a one-year term, and each sublease served as an integral part of the total agricultural enterprise by providing healthy crop rotation. Hayles engaged in farming and subleased fields to promote farming. Accordingly, the exclusion for property damage arising from a nonfarm "business" of the insured does not apply. CP at 788.

¶26 IV. Exclusion for farm management. The farm policy also excludes property damage arising from the insured's performance of—or failure to perform—the farming operations of another entity under a "farm management" agreement. *Id.* "Farm management" is defined in the policy as management of "the entire or partial 'farming' operations of another for a fee pursuant to a contract or agreement . . . whereby the farm manager directs and administers the culture, care and/or harvest of that 'farming' operation." *Id.* at 802. Nationwide contends Hayles's operation of the irrigation system was, in fact, management of a part of the Ezquivels' farming operation. It asserts that Hayles thus entered into a farm management agreement with the Ezquivels and caused injury to the onion crop when it failed to properly perform under the agreement.

¶27 Even if use of the irrigation equipment may have constituted a part of the entire farming operation of growing onions, Hayles did not act as a manager of that operation. As the exclusion states, the "farm manager" must direct and administer the culture, care, and/or harvest of the onions. Hayles had no management duties under the sublease. Its only duties were to maintain the efficacy of the irrigation system and to turn it on and off when requested. Thus, the exclusion for damages arising from farm management does not apply.

¶28 V. Exclusion for ownership or control of premises. Finally, Nationwide contends coverage is excluded because the property damage did not arise from an act or omission on an "insured location." *Id.* at 788. The policy defines an "insured location," in part, as the premises shown in the declarations section. *Id.* at 803. According to

Nationwide, one section of the field subleased to the Ezquivels is not specifically included in the list of covered farm locations. Consequently, it argues, this exclusion applies because not all of the damage to the onions occurred in an insured location. In response, Hayles filed an affidavit by its insurance agent that indicates the property in question is included in a legal description of a larger section of insured property.

¶29 Whether or not the entire field is specifically listed in the farm locations section, however, the blanket coverage endorsement extends the definition of "insured location" to "any other location that you own, rent or occupy, provided that . . . [t]he location is used exclusively for 'farming' purposes." *Id.* at 815. Nationwide contends the Ezquivels' field, admittedly leased by Hayles, was not used exclusively by Hayles for farming purposes. It argues that the land was used by Hayles as sublease property for rental profits. But the policy does not state that the location must be exclusively farmed by the *insured*, simply that it must be used exclusively for farming. Whether the land was leased by Hayles or subleased to the Ezquivels, it was being used exclusively for farming. Under the clear terms of the blanket coverage endorsement, the entire field subleased by the Ezquivels was an insured location, and property damage arising from an act or omission by Hayles in connection with that location was covered by the policy.

ATTORNEY FEES

¶30 Hayles requests attorney fees in a section of its respondents' brief, citing *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991). Attorney fees to the prevailing party on appeal are permitted only if authorized by contract, statute, or a recognized ground in equity. *Panorama Vill.*, 144 Wn.2d at 143. One such equitable ground was recognized in *Olympic Steamship*, 117 Wn.2d at 53, which held that when insureds are forced to sue for the benefit of their insurance contracts,

they are entitled to attorney fees. *Panorama Vill.*, 144 Wn.2d at 143. The trial court awarded Hayles attorney fees for successfully suing for coverage. Because Hayles also prevails before this court, it is entitled to attorney fees and costs on appeal. *Id.* at 143-45.

¶31 Affirmed.

SWEENEY, C.J., and BROWN, J., concur.