[No. 28818-4-II. Division Two. July 8, 2003.]

TODD ROBISON, ET AL., *Appellants*, v. CASCADE HARDWOODS, INC., *Respondent*.

554

*David L. Harpold*, for appellants.

*Scott M. Barbara* (of *Johnson, Christie, Andrews & Skinner*), for respondent.

HUNT, C.J. — Todd Robison, a logging truck driver, appeals the trial court's grant of summary judgment to Cascade Hardwoods, Inc. Robison sued Cascade for damages from severe internal injuries caused by an extreme electrical shock while operating Cascade's trailer loader apparatus at Cascade's lumber mill. Robison argues that summary judgment was improper because (1) under the doctrine of res ipsa loquitur, ordinarily such an electrical shock would not occur absent negligence; and (2) the only reasonably possible source of the electricity was under Cascade's exclusive control. We agree, reverse, and remand for trial.

## FACTS

### I. Electric Shock While Operating Trailer Loader

It had been raining heavily for hours when Robison delivered a load of logs to Cascade in March 1994. There was no evidence of any lightning or thunderstorms that early spring day, just driving rain.

After Cascade workers unloaded the logs from his truck, Robison proceeded to Cascade's "trailer loader," an apparatus that lifts an empty trailer and places it on top of the truck tractor, piggyback, to shorten the unit and to make it easier to drive. While operating the trailer loader, an exceptionally powerful electrical shock rendered Robison unconscious and caused severe internal electrical burns.

Cascade obtains 12,500 volts of electricity from the local electrical utility (which grounds at 7,200 volts). Cascade then distributes the electricity to a transformer, which steps down the voltage to 480 (grounding at 277 volts). After being routed through distribution panels, overhead wires carry this voltage to the trailer loader's motor, which is again stepped down to 24 volts at the trailer loader winch.

### A. The Trailer Loader

Cascade's electrically powered trailer loader comprises a metal A-frame, a steel cable winch, and a hook hanging from the crossbar. The truck driver swings the hook over to a wire cable grapple strap on his truck trailer, connects the hook to the strap, and presses his thumb on a "free swinging" "up/down controller" button on a cord dangling from the loader's crossbar. 3 Clerk's Papers (CP) at 440, 437. This button, powered by a 24-volt electric controller, activates a steel winch powered by a 480-volt electric motor.

The winch motor operates only while the truck driver is pressing the up/down controller button. The driver continues to press the controller button to make the winch wind the steel cable, causing the loader's hook to lift the truck

trailer off the ground. The driver then swings the trailer over the truck's cab, where he lowers the trailer onto supports. When he lifts his thumb off the controller button, the winch motor stops.

## B. The Accident

On the day of Robison's electrical injuries, the rainwater had accumulated under the trailer loader to such a depth that it seeped over Robison's ankle-covering rubber boots. Standing in the pool of rainwater, Robison leaned his stomach against his truck chassis to reach one rubber-gloved hand out to connect the loader's hook to his trailer's strap. With his other rubber-gloved hand, Robison pressed the loader's controller button to activate the cable winch motor. As he pressed the button, he heard a loud bang and everything went gray. He was rendered unconscious for about a minute and a half.

When Robison regained consciousness, he felt shaky all over and experienced severe pain in his chest and queasiness in his stomach. Using wooden sticks to push the loader's control buttons, he managed to finish loading his trailer. Still shaking and with his chest burning inside, he immediately made the short 300-foot drive to Cascade's office, where a Cascade employee saw him sweating, out of breath, and extremely thirsty. Robison sat down and drank as much water as he could, even though he had great difficulty holding the cup in his hand. After Robison rested for a few minutes, Lawrence "Swede" Johnson, a Cascade safety and quality control director, took Robison to the hospital's emergency room, where Robison was admitted.

## II. Electrical Injuries

Although Robison was not burned externally, he suffered severe internal burns and chronic, debilitating medical conditions: (1) burns in his esophagus and mouth; (2) burn-like lesions in his stomach and intestines; (3) chronic fecal incontinence; (4) occasional throbbing headaches; (5)

hearing loss from a ruptured tympanic membrane; (6) permanent blurred vision, light sensitivity, and night blindness; (7) destruction of over half his teeth; (8) sharp, chronic pains in his abdomen and joints; (9) intermittent seizures; (10) gallstones; and (11) memory loss. These conditions have required five surgeries on his stomach and intestines to repair burned tissue and remove the stones, as well as extensive psychotherapy.

Since 1990, Dr. Andrew Willner has been Robison's primary physician at the Enunclaw Medical Clinic, where Robison had long been a patient even before seeing Dr. Willner. In addition to training in electrical injuries during his residency and his experience with electrical injuries in the emergency room, Dr. Willner has treated other patients with electrical injuries over the years, 50 percent of whom, like Robison, did not exhibit visible entry and exit points. Dr. Willner's expert medical opinion was "that to a degree of reasonable medical certainty Mr. Robison sustained an electrical burn that included intrathoracic and gastrointestinal membranous injury." 1 CP at 155.

The State Department of Labor and Industries (L&I) hired Dr. Borys Buniak, a gastrointestinologist from Syracuse University, to provide expert opinion about the cause of Robison's injuries. Since 1993, Dr. Buniak has seen patients with electrical injuries. He, too, opined that Robison's injuries, some of which developed over time after the shock, were causally related, "on a more-probable-than-not basis," to an electrical injury with a severe burn.[1] 1 CP at 168.

Dr. Raphael Lee, director of the electrical trauma research program and professor at the University of Chicago, concurred. Dr. Lee stated that the absence of external burns, as with all of Robison's symptoms, was consistent

---

[1] Dr. Buniak answered a question about whether Robison's ongoing medical problems were caused by "the alleged electrical injury" as follows: "With electrical injury you never see all of it happen at once. It all happens over a span of years. So [Robison] has followed the same route as some of my other patients have, and ... I do believe that, yes, I think this is causally related. ... On a more probable basis." 1 CP at 168-69.

with burn victims who are electrically shocked while in water, such as a swimming pool, a pond, or standing water on a golf course. He understood that at the time of Robison's electrical contact, it was a rainy day, "everything was just so soaking wet," and Robison's booted feet were immersed in mud. 1 CP at 173.

### III. CASCADE'S MAINTENANCE OF TRAILER LOADER'S ELECTRICAL SYSTEMS

The origin of the electric shock that burned Robison is uncertain. Robison's electrical expert essentially eliminated the 24-volt transformer for the trailer loader's winch, but the record does not eliminate other electrical components associated with the trailer loader and its vicinity. Although Cascade argues that Robison's truck was not eliminated as a source, nothing in the record suggests that the truck or its 12-volt truck battery would have had sufficient electrical capacity to have been the source of such severe electrical burns. And there is no evidence of any electrical storm or lightning on that early March day.

### A. Previous Incidents

In the days and months before Robison's accident, other logging truck drivers had reported minor "tingles," "buzzes," or "the bite" of an electric shock while operating Cascade's trailer loader. On one occasion, a truck had hit the trailer loader and severed some hot wires. Each time a report was received, Cascade's mill electrician had identified and corrected the problems, but otherwise Cascade apparently took few, if any, proactive, preventative measures.[2]

Less than an hour and one-half before Robison's accident, Robert Thompson had reported to Cascade that he (Thompson) had been shocked at the trailer loader. Thompson felt

---

[2] Periodically, Cascade checked the trailer loader's electrical motor and connections.

an electric tingle while standing in the pool of water at the trailer loader. When he "grabbed ahold of the button, . . . [he] could feel kind of a little surge." 1 CP at 129. He knew that something was "haywire," 1 CP at 420, so he tried to avoid grabbing the hook until after he had taken his finger off the up/down controller button. As he lifted his trailer, his elbow hit the metal steady rod on the trailer loader's frame and he felt a shock similar to getting "smacked in the funny bone"; the jolt felt like "it should have broke[n] skin." 3 CP at 444, 445. Afterward, Thompson warned other truck drivers that the trailer loader "will bite you," just as another truck driver had previously warned him. 1 CP at 131.

### B. Electrical Inspections

While Robison was being taken to the emergency room, Cascade employees alerted the yard electrician, Bill Smith. Smith removed the trailer loader from service for four and one-half hours, checked all wiring, and found no blown fuses. He did, however, measure a 0.56-volt reading from a hot wire in the trailer-loader controller-button circuit to the earth, which Robison's electrical engineer later testified was anomalous. But Smith reported no problems to Cascade management. During the next graveyard shift, Cascade's assistant electrician repeated the inspection and also found and reported nothing unusual.

Robison's electrical expert, Edward Schaefer, however, explained that the anomaly of the 0.56-volt reading from the controller button showed that Cascade had failed to implement an effective electrical preventive maintenance program; had Cascade implemented such a program, it would "always detect such anomalous [electrical] grounds such as that present at Cascade Hardwoods." 1 CP at 112.

During an inspection some 11 weeks after Robison was injured, an L&I investigator reported that he found no electrical problems with the trailer loader; but the record does not show whether the inspection took place during a

very heavy rain, similar to the day Robison was injured, or whether there was any standing water. The inspector also found no evidence of burns or arc marks on any associated equipment and no evidence of what might have caused Robison's accident. The L&I inspector did note, however, that there was "torn rubber" around the loader's controller button, and he cited Cascade for failure to ensure "that the pendent control switches installed in wet locations [are] enclosed in weatherproof enclosure."[3] 3 CP at 411.

## IV. LAWSUIT

Robison sued Cascade, alleging that he "suffered a severe electrical shock and electrical burns from a defective control mechanism" in Cascade's trailer loader, attributable to Cascade's negligence in:

> a. Providing an unreasonably unsafe piece of equipment for the use of drivers delivering logs;

> b. Failure to take appropriate action to repair or replace unsafe equipment;

> c. Failure to warn truck drivers of the risk of electrical shock from using the trailer/loader mechanism when they knew or should have known that it was inherently unsafe and dangerous for the ordinary use of the truckers[; and]

> d. Violation of safety regulations of the Department of Labor and Industries, State of Washington.

Suppl. CP at 554.

Cascade moved for summary judgment, arguing that (1) it was not liable to business invitee Robison for unknown defects in the trailer loader that it had adequately inspected; (2) res ipsa loquitur cannot apply to the trailer loader; and (3) Mrs. Robison cannot claim loss of consortium

---

[3] The L&I inspector also opined that these violations could not have caused Robison's injuries.

because she knew about Mr. Robison's injuries before they married.[4]

Robison responded that Cascade's trailer loader was an "instrument in" his injuries, although not their "source," which he asserted was "the defective electrical system of the plant." 1 CP at 91. Invoking the doctrine of res ipsa loquitur, he argued that there must have been a flaw with the electrical system because there "is no alternative way in which [he] could have sustained the injury."[5] 1 CP at 91. Cascade had exclusive control over not only its premises and electrical system but also the electricians who performed maintenance and repairs to Cascade's electrical systems.

The trial court granted Cascade's motion for summary judgment, dismissed Robison's case with prejudice, and awarded attorney fees to Cascade. Robison appeals.

## ANALYSIS

### I. Standard of Review

■■ Summary judgment is appropriate if all the pleadings, depositions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The moving party has the burden of proving that no factual dispute exists that might affect a trial's outcome. *Allstate*

---

[4] Loss of consortium is not an issue on appeal. Robison assigned no error to the trial court's dismissal of Mrs. Robison's loss of consortium claim and did not reply to Cascade's argument that summary judgment was proper with respect to Mrs. Robison's loss of consortium claim. Thus, under RAP 10.3(a)(3), the dismissal of Mrs. Robison's loss of consortium claim is not before us on appeal and, therefore, the trial court's dismissal of this claim remains dismissed.

[5] Robison offered an electrical engineer's expert testimony that the trailer loader, with a 24-volt control system and a 480-volt motor, clearly did not have enough voltage to have caused Robison's injuries by themselves. The electrical engineer also opined that (1) old mills often have old, disconnected, buried power lines and conduits from having moved various electrically powered machines; (2) the insulation on buried wires will deteriorate, exposing them; (3) exposed wires will charge the nearby ground; and (4) water, a strong conductor, could then have conducted the electrical charge to Robison. The trial court did not rule on Cascade's motion to strike this testimony for lack of foundation.

*Ins. Co. v. Raynor*, 143 Wn.2d 469, 475-76, 21 P.3d 707 (2001). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Allstate*, 143 Wn.2d at 475.

■ Whether res ipsa loquitur applies to a particular case is a question of law, which we review de novo. *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003).

## II. RES IPSA LOQUITUR

■ Our Supreme Court recently addressed the doctrine of res ipsa loquitur in a unanimous decision, explaining:

> The doctrine of res ipsa loquitur spares the plaintiff the requirement of proving specific acts of negligence in cases where a plaintiff asserts that he or she suffered injury, the cause of which cannot be fully explained, and the injury is of a type that would not ordinarily result if the defendant were not negligent. In such cases the jury is permitted to infer negligence. The doctrine permits the inference of negligence on the basis that the evidence of the cause of the injury is practically accessible to the defendant but inaccessible to the injured person.

*Pacheco*, 149 Wn.2d at 436 (citations omitted). This language is directly applicable here.

## A. Burden of Proof

Stated another way, res ipsa loquitur is a rule of evidence that allows an inference of negligence from circumstantial evidence to prove a defendant's breach of duty where (1) the plaintiff is not in a position to explain the mechanism of injury, and (2) the defendant has control over the instrumentality and is in a superior position to control and to explain the cause of the injury. *Morner v. Union Pac. R.R.*, 31 Wn.2d 282, 291-92, 196 P.2d 744 (1948).

■ A plaintiff presenting a res ipsa loquitur theory retains the ultimate burden of persuading the court by a preponderance of evidence that negligence has occurred.

*Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 157, 480 P.2d 260 (1971). But once the plaintiff has produced sufficient evidence to raise the res ipsa loquitur inference, a jury question has been raised unless the defendant produces evidence of an alternate cause rebutting the inference.[6] *See Metro. Mortgage & Sec. Co. v. Wash. Water Power*, 37 Wn. App. 241, 243, 679 P.2d 943 (1984);[7] *see also Zukowsky v. Brown*, 79 Wn.2d 586, 601-02, 488 P.2d 269 (1971); *Morner*, 31 Wn.2d at 291; *Firebaugh v. Seattle Elec. Co.*, 40 Wash. 658, 664, 82 P. 995 (1905);[8] 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE §§ 301.13-.14, at 194, 195 (4th ed. 1999).[9]

As the Supreme Court recently summarized the res ipsa loquitur burden of proof in *Pacheco*,

> In our judgment, it makes little sense to deny . . . the doctrine of res ipsa loquitur simply because the defendant offers evidence that provides a possible explanation of the event. As

---

[6] This is appropriate because the defendant often has more access and control over the evidence. *See, e.g., Pacheco v. Ames*, 110 Wn. App. 912, 915-16, 43 P.3d 535 (2002) (defendant "is in the best position to explain the cause of injury" and "should be required to produce evidence to explain" it), *rev'd on other grounds*, 149 Wn.2d 431, 69 P.3d 324 (2003); *Pacheco*, 149 Wn.2d at 436 (res ipsa loquitur applies when "the evidence of the cause of the injury is practically accessible to the defendant but inaccessible to the injured person").

[7] In *Metropolitan Mortgage*, the court held that the nature or circumstances of an accident may be "sufficient to establish prima facie the fact of negligence on the part of the defendant, without further direct proof," thus casting "upon the defendant the duty to come forward with an exculpatory explanation, rebutting or otherwise overcoming the presumption or inference of negligence on his part." *Metro. Mortgage*, 37 Wn. App. at 243. The court held that a prima facie res ipsa case "present[s] a question for the jury." *Metro. Mortgage*, 37 Wn. App. at 243.

[8] In *Firebaugh*, a Seattle street car passenger was injured while leaping to safety after the car's controller blew out, causing an explosion that filled the car with flames and smoke. *Firebaugh*, 40 Wash. at 660. Although defendant Seattle Electric offered proof that it could not determine what had caused the accident, the court held that " 'a presumption of negligence on the part of the company usually arises from proof of' " the res ipsa prerequisites and, " 'in the absence of anything to the contrary . . . the burden is then cast upon the company to show that its negligence did not cause the injury.' " *Firebaugh*, 40 Wash. at 664 (quoting 4 BYRON K. ELLIOTT & WILLIAM F. ELLIOTT, LAW OF RAILROADS § 1644 (1897)).

[9] Res ipsa loquitur "seems to embody the Thayer theory of presumptions," TEGLAND, *supra*, at 196, shifting "the burden of producing contrary evidence to the party against whom it operates," which destroys the presumption like a "bursting bubble." TEGLAND, *supra*, at 194.

noted above, the res ipsa loquitur doctrine allows the plaintiff to establish a prima facie case of negligence when he cannot prove a specific act of negligence because he is not in a situation where he would have knowledge of that specific act. Once the plaintiff establishes a prima facie case, the defendant must then offer an explanation, if he can.

*Pacheco*, 149 Wn.2d at 441.

## B. Application of Res Ipsa Loquitur

■ Res ipsa loquitur allows the inference of a defendant's negligence from circumstantial evidence when the evidence shows that

"(1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff."

*Pacheco*, 149 Wn.2d at 436 (quoting *Zukowsky*, 79 Wn.2d at 593).[10] These three prerequisites are met here.

### 1. Severe Electrical Shocks Unlikely Absent Negligence

■ Whether an injury supports a reasonable and legitimate (as opposed to conjectural) inference of negligence requires that the context, manner, and circumstances of the injury are "of a kind that do not ordinarily happen in the

---

[10] Section 328D (1) of the *Restatement (Second) of Torts* (1965) states,

It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

absence of someone's negligence."[11] *Zukowsky*, 79 Wn. 2d at 594-95. The law recognizes three such situations:

"(1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries."

*Pacheco*, 149 Wn.2d at 438-39 (quoting *Zukowsky*, 79 Wn.2d at 595). The facts here fit the second, and perhaps third, situations.

Robison's uncontroverted evidence indicates that he received "a severe electrical shock and electrical burns" while operating Cascade's electrically powered trailer loader, on Cascade's premises, on a very rainy day, when the ground beneath the trailer loader was saturated with water. Suppl. CP at 553. Three medical experts concluded that electrical shock caused his severe injuries and medical symptoms, all of which he did not begin experiencing until after regaining consciousness at Cascade.

At this point, Cascade does not deny that Robison suffered an electrical shock; it strictly contends that it is speculative and inconclusive to say that the source or cause of the electric shock came from stray electricity from Cascade's equipment. Without producing any affirmative evidence, Cascade argues that Robison cannot prove that his shock did not come from lightning or his own truck.

Taken in the light most favorable to Robison, the record belies Cascade's claims: There is no evidence of any lightning on this rainy day in late winter/early spring, and the electrical evidence suggests that a 12-volt battery could not have caused Robison's severe burns. The record shows that Robison's severe internal burns and injuries, without vis-

---

[11] Generally, the doctrine applies to "peculiar and exceptional cases, and only where the facts and the demands of justice make its application essential." *Morner*, 31 Wn.2d at 293.

ible external signs, were consistent with electrical shock received while standing in a pool of water.

We know from general experience and observation that, absent evidence of an act of God,[12] individuals ordinarily do not suffer severe electrical shocks unless someone has been negligent. For instance, in *Faust v. Benton County Public Utility District No. 1*, 13 Wn. App. 473, 474-75, 535 P.2d 854 (1975), a Hanford security officer responding to a fire alarm was fatally electrocuted; a downed power line was found a few feet from his body. The court held that "[i]t is apparent that the type of injury here does not ordinarily occur in the absence of someone's negligence." *Faust*, 13 Wn. App. at 476. *See also Johnson v. Otis Elevator Co.*, 225 Pa. Super. 500, 311 A.2d 656 (1973);[13] *Nat'l Sur. Corp. v. Travelers Ins. Co.*, 149 So. 2d 438, 440 (La. Ct. App. 1963) (" 'Cases involving injuries inflicted on the plaintiff by steam, electricity, fire, gas, complicated industrial machinery, and other dangerous instrumentalities furnish the clearest instances of the use of the doctrine of res ipsa loquitur.' " (quoting *N.W. Mut. Fire Ass'n v. Allain*, 226 La. 788, 77 So. 2d 395, 397 (1954))). Similarly, Robison should not expect to suffer extreme shocks absent negligence, and his claim meets the first res ipsa loquitur prerequisite.

### 2. Exclusive Control Over Cascade's Electrical System

The seminal issue in this case is identity of the "instrumentality." Cascade argues that Robison lacks evidence of any particular electrical source attributable to Cascade. Robison's theory is that the "defective electrical system of [Cascade's] plant" must have caused his injuries because there "is no alternative way in which [he] could have

[12] Again, there is no evidence of an act of God, only Cascade's speculation about the unlikely possibility of lightning.

[13] In *Johnson*, the Pennsylvania Supreme Court held an elevator manufacturer liable for personal injuries sustained when a bolt of electricity or fire emanating from an automatic elevator door's "electric eye" mechanism struck the plaintiff, where the accident was of such a nature that it would not have happened unless the manufacturer was negligent. *Johnson*, 311 A.2d at 656-58.

sustained" his very severe electrical shock. 1 CP at 91. Thus, the issue is whether Robison has sufficiently identified the "instrumentality" causing his shock as stray electricity emanating from some part of Cascade's electrical system associated with or near the trailer loader.[14]

■ Generally, the defendant must have exclusive, "actual or constructive control" of the "instrumentality" to the extent that it caused the injury. *Zukowsky*, 79 Wn.2d at 595. This reflects the logical requirement that " 'the apparent *cause* of the accident must be such that the defendant would be responsible for any negligence connected with it.' " *Zukowsky*, 79 Wn.2d at 595 (emphasis added) (quoting William Lloyd Prosser, *Res Ipsa Loquitur in California*, 37 CAL. L. REV. 183, 201 (1940)).

The Washington Supreme Court has recently addressed the specificity required in identifying the "instrumentality."[15] Rejecting the Court of Appeals decision as one that

---

[14] Robison, through the expert opinion of an electrical engineer specializing in electrical distribution systems, equipment, and injuries in industrial settings, has also presented one specific theory: that an old, frayed, underground, electrical wire had electrified the soggy ground which conducted the current to Robison. 1 CP at 114 ("electrification of the earth . . . provided the source of electricity which shocked Robison").

[15] Other states have also addressed the degree of specificity required in identifying the "instrumentality" in the context of electricity cases:

In *Briar v. Elder-Beerman Department Store, Inc.*, 645 N.E.2d 8, 12 (Ind. Ct. App. 1994), the plaintiffs alleged that a "lamp, [lamp] display, or something associated with the display" was the instrumentality causing an electrical shock, but they "admitted they did not know the exact cause of the shock." The court held that res ipsa may apply even "where the specific instrumentality [is] unknown" and that the plaintiffs had "designated alternatives that could have caused [the] injuries," reasoning:

> The doctrine of res ipsa loquitur is designed to allow an inference of negligence and proof of the specific cause of injury is not required. In fact, a number of different causes or inferences may be left to the final determination of the trier of fact. Here, the Briars were only required to show that Elder-Beerman was responsible for all reasonably probable causes to which the accident could be attributed.

*Briar*, 645 N.E.2d at 13 (citations omitted).

In *Gayheart v. Dayton Power & Light Co.*, 98 Ohio App. 3d 220, 648 N.E.2d 72, 78 (1994), the Gayhearts presented evidence that a "power surge" carried over a power line "was the 'instrumentality' " that caused an electrical fire. Dayton Power and Light (DP & L) argued that the plaintiffs were "unable to point to the exact cause of the power surge." *Gayheart*, 648 N.E.2d at 79. Dismissing the

"would defeat the doctrine of res ipsa loquitur in cases where the defendant offers *some* evidence explaining the injury," *Pacheco*, 149 Wn.2d at 440, our Supreme Court ruled:

> In adopting the rule that the doctrine of res ipsa loquitur is inapplicable only where the evidence *completely* explains the plaintiff's injury, we have noted that a plaintiff is not bound by the testimony of the defendant or his witnesses. Thus, the plaintiff may be entitled to rely on the res ipsa loquitur doctrine even if the defendant's testimony, if believed by the jury, would explain how the event causing injury to the plaintiff occurred. . . . Even where the defendant offers weighty, competent and exculpatory evidence in defense, the doctrine may apply. *In sum, the plaintiff is not required to " 'eliminate with certainty all other possible causes or inferences' " in order for res ipsa loquitur to apply. Douglas* [v. *Bussabarger*], 73 Wn.2d [476,] at 486[, 438 P.2d 829 (1968)] (quoting William L. Prosser, Handbook of the Law of Torts 222 (3d ed. 1964)).

*Pacheco*, 149 Wn.2d at 440-41 (second emphasis added) (footnote and some citations omitted).

 Similarly here, Robison's inability to specify the "exact cause" of his electrical injuries is not fatal.[16] Robison has designated Cascade's "defective electrical system" as the instrumentality, 1 CP at 91, which is just as specific as identifying a "power surge." *Gayheart v. Dayton Power & Light Co.*, 98 Ohio App. 3d 220, 648 N.E.2d 72, 78 (1994).

suggestion that lightning or a car accident could have caused the fire as unsupported by the evidence, the court reasoned:

> [T]he three remaining possible causes [were] under the exclusive control of DP & L. The fact that the Gayhearts cannot specify exactly which of the three remaining possible causes created the power surge does not strengthen DP & L's argument. Rather, it makes the case a particularly appropriate one for the application of the *res ipsa loquitur* doctrine. Had the Gayhearts been able to point to the exact cause of the power surge, there would be no need for the *res ipsa loquitur* doctrine in this case.

*Gayheart*, 648 N.E.2d at 79. The court also held that even if "the Gayhearts did not eliminate the possibility that the fire was caused by their own faulty wiring," they had presented testimony that their electrical system was "up to Code" and a res ipsa loquitur plaintiff " 'need not eliminate all reasonable non-negligent causes of his injury.' " *Gayheart*, 648 N.E.2d at 79 (quoting *Jennings Buick, Inc. v. City of Cincinnati*, 63 Ohio St. 2d 167, 406 N.E.2d 1385, 1389 (1980)).

[16] *See also Briar*, 645 N.E.2d at 12-13; *Gayheart*, 648 N.E.2d at 79.

 A defective electrical system is a "reasonably prob-able cause[ ]" for his injuries. *Briar v. Elder-Beerman Dep't Store, Inc.*, 645 N.E.2d 8, 13 (Ind. Ct. App. 1994).[17] Cascade operates a 12,500-volt electrical system that, although stepped down, serviced the trailer loader Robison was operating when he was shocked. Moreover, other truckers had previously experienced electrical shocks while operat-ing the trailer loader, though none of those shocks had been as severe or debilitating as the one that seared Robison's internal organs. Robison's expert indicates that only Cas-cade's electrical system had the quantity of power sufficient to have caused Robison's severe electrical burns.

Cascade has neither disputed that it exclusively controls its own electrical system and electrical current[18] nor pre-sented evidence of any other possible cause. Drawing all factual inferences in Robison's favor, he has sufficiently designated a "reasonably probable cause[ ]" for his severe injuries, *Briar*, 645 N.E.2d at 13, and satisfied the "logical requirement" that " 'the apparent cause of the accident must be such that the defendant would be responsible for any negligence connected with it.' " *Zukowsky*, 79 Wn.2d at 595 (quoting PROSSER, LAW OF TORTS at 201).

 Cascade's contention that Robison cannot show that other sources did not cause his substantial electrical burns lacks merit. *See, e.g.*, Br. of Resp't at 31 (asserting Robison could not show the electricity did not come from his own truck); CP at 246 (workplace rumor that static electric-ity may have been cause). Robison " 'need not eliminate all reasonable non-negligent causes' " when there are compet-ing factual inferences. *Gayheart*, 648 N.E.2d at 79 (quoting *Jennings Buick, Inc. v. City of Cincinnati*, 63 Ohio St. 2d 167, 406 N.E.2d 1385, 1389 (1980)). *See also Pacheco*, 149

---

[17] In related situations, Washington has similarly described the "instrumental-ity" prerequisite as identifying the "apparent cause" of the injury. *Zukowsky*, 79 Wn.2d at 595. *See also* RESTATEMENT, *supra*, § 328D(1)(b) (requiring evidence to "sufficiently eliminate[ ]" "other responsible causes").

[18] For instance, Cascade has not submitted any documents indicating joint ownership or licenses, any description of its relationships with independent contractors, or any other evidence indicating that others shared control of the electrical system.

Wn.2d at 441 (need not " ' "eliminate with certainty all other possible causes or inferences" ' ") (quoting *Douglas*, 73 Wn.2d at 486 (quoting Prosser, Law of Torts at 222)); *Briar*, 645 N.E.2d at 13.[19] Even assuming that Cascade's isolated and speculative comments are "reasonable" alternative causes,[20] because the defective electrical system is also a reasonably probable cause, it is for the trier of fact to choose between the possibilities.

Applying res ipsa loquitur here comports with the purpose of the doctrine. As the Supreme Court has recently explained,

> [i]f the doctrine of res ipsa loquitur were inapplicable when a defendant offered a possible explanation that was not completely explanatory of the cause of the injury, and the plaintiff could not establish a prima facie case of negligence because he or she does not know how the injury was caused, then the defendant could avoid liability by simply submitting evidence of a possible cause of the injury. This would be the case notwithstanding the fact that the plaintiff has shown all of the above-stated elements of the doctrine of res ipsa loquitur. Such a result would allow the defendant to escape responsibility where an inference of negligence is the only tool with which the plaintiff may prove his or her case.

*Pacheco*, 149 Wn.2d at 442.

Here, Robison does not own the property; does not have access to all the cables, lines, circuits or other routes in the power distribution system; and does not know of historical changes that have been made to the electrical system. There is little doubt that Cascade is in the best position to

---

[19] And in *Firebaugh*, the court noted that the defendant had offered testimony "showing different causes for the explosion" perhaps within the defendant's control, but held that these alternate causes raised "a question for the jury." *Firebaugh*, 40 Wash. at 666. *See also Pacheco*, 110 Wn. App. at 918 (when " 'the precise cause of the injury' " is clear from evidence, " 'there is no basis or foundation for' " the res ipsa doctrine) (quoting 1 Stuart M. Speiser, The Negligence Case: Res Ipsa Loquitur § 1:3, at 9 (1972)).

[20] This assumption appears unwarranted. Robison's expert, while concluding that Cascade's electrical system caused Robison's injuries, indicates that the trailer loader, with a 24-volt controller, "almost certainly" could not have caused Robison's injuries. 1 CP at 111. Thus, it is hard to imagine how either the truck or static electricity would have been powerful enough.

explain how Robison could suffer severe electrical injuries while operating electrical machinery on Cascade's property. But rather than producing any affirmative evidence,[21] Cascade moved for summary judgment, challenging Robison's ability to pinpoint a source. This is inconsistent with the purpose of the res ipsa doctrine. *See, e.g., Joseph T. Ryerson & Son v. H.A. Crane & Brother*, 417 F.2d 1263, 1266-67 (3d Cir. 1969) ("The operative effect of a res ipsa charge is to force a defendant, who usually knows more about the instrumentality allegedly causing the injury, to bring out all that he knows.").

Thus, Robison sufficiently designated stray electricity as the instrumentality of his injuries and Cascade's electrical system as the sole likely source, as the reasonably probable cause, under Cascade's exclusive control.

### 3. No Contributory Negligence

As for the third prerequisite, Cascade argues that Robison contributed to his own injuries because he knew there was a risk of shock in operating the trailer loader and nevertheless chose to use it. Robison counters that the evidence shows no such contributory negligence.

The Supreme Court has explained that the third prong of the res ipsa loquitur test does not require a plaintiff to produce evidence that "preclude[s] the possibility that defendant can establish a defense based on plaintiff's conduct." *Zukowsky*, 79 Wn.2d at 596.[22] Rather, it bars the doctrine only if, "after all evidence is in, it can be said as

---

[21] Here, Cascade produced no expert or other evidence that, for instance, the "electrified earth theory" did not apply to it, instead arguing that Robison has not placed into evidence the requisite facts for his own theory. Am. Br. of Resp't at 21-22. It did not excavate the affected ground under and around the trailer loader or submit affidavits denying the presence of any underground wires. Nor did Cascade produce evidence that it does not exclusively control the overhead wires or the electrical current on its premises.

[22] *See also, e.g., Faust*, 13 Wn. App. at 476 n.3; *Ewer*, 4 Wn. App. at 158 ("The third requirement does not mean that plaintiff must conclusively prove no action on his part contributed to the accident but rather that he bring forth sufficient evidence to allow a jury to exclude his conduct as a responsible cause.").

a matter of law that plaintiff is precluded from recovery by his own 'voluntary action or contribution' " because, in these cases, "the evidence wholly refutes plaintiff's right to recover for any such negligence." *Zukowsky*, 79 Wn.2d at 596.

Here, not all of the evidence is in at this summary judgment phase, and the existing evidence does not wholly refute Robison's right to recover. *Zukowsky*, 79 Wn.2d at 596. The only hint of arguable negligence by Robison is that he proceeded to Cascade's log dump and used Cascade's trailer loader after being told by a friend, "You get into Cascade for chrissakes *watch out for the trailer loader* because that prick *will bite you* because it's already bit me several times while I was there." 3 CP at 423 (emphasis added). Even if Robison were contributorily negligent for having operated the trailer loader despite this minimal admonition,[23] which did not begin to suggest the massive electrical shocks he suffered, Robison need not conclusively eliminate the possibility of his own negligence:

> "[E]ven where there is some evidence that plaintiff's failure to exercise care in the use of defendant's equipment was a contributing cause producing the injury, the doctrine is not excluded as a matter of law; rather the case is to be submitted to the jury with proper instructions permitting the jury to draw the inference of defendant's negligence if it finds that plaintiff by his own conduct was not responsible for causing his injury."

*Ewer*, 4 Wn. App. at 159 (quoting *Powell v. Moore*, 228 Or. 255, 364 P.2d 1094, 1100 (1961)). Accordingly, Robison has met the third and final prerequisite for res ipsa loquitur.

## 4. Summary

Robison has established all of the res ipsa loquitur prerequisites. Because Cascade has merely challenged Robison's evidence and has not responded with affirmative evidence of an alternate cause, Robison has raised a per-

---

[23] Other than this, Robison was wearing rubber boots and gloves, and there is no evidence indicating that he was operating it incorrectly or carelessly.

missive inference of negligence that necessarily creates a jury question. *See Metro. Mortgage,* 37 Wn. App. at 243; *see also Zukowsky,* 79 Wn.2d at 601-02; *Morner,* 31 Wn.2d at 291; *Firebaugh,* 40 Wash. at 664; 5 TEGLAND, *supra.*

That a plaintiff does not know how the injury was caused does not defeat his use of the res ipsa loquitur "tool"—the inference of the defendant's negligence—where the plaintiff has shown all of the required elements of the doctrine of res ipsa loquitur. *Pacheco,* 149 Wn.2d at 440-42. Where, as here, the elements of res ipsa loquitur are satisfied, a plaintiff is entitled to the doctrine even if the defendant's evidence suggests, but does not completely explain, how the event causing injury to the plaintiff may have occurred. *Pacheco,* 149 Wn.2d at 440-42.

Here, a genuine issue of material fact remains, and summary judgment was improper.

### III. "PREMISES LIABILITY"

Because we hold that res ipsa loquitur applies, we do not address issues of "premises liability," Am. Br. of Resp't at 14-19, an alternate way of proving negligence which, in any event, Robison has chosen not to pursue on appeal.

As for Robison's other negligence claims against Cascade, we reverse the summary judgment and remand for trial.

MORGAN and ARMSTRONG, JJ., concur.

Reconsideration denied August 12, 2003.