[No. 33649-5-I.   Division One.   January 29, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. VIRGINIA WARDEN, *Appellant*.

---

*Carl F. Luer* of *Washington Appellate Defender Association*; and *Eric Broman* and *Nielsen & Acosta*, for appellant.

450

*Norm Maleng, Prosecuting Attorney,* and *Catherine Hendricks, Deputy,* for respondent.

BECKER, J. — Virginia Warden, on trial for a brutal homicide, presented evidence of diminished capacity. Because the trial court refused to instruct on first and second degree manslaughter, and these instructions were supported by the evidence, we reverse her conviction for second degree murder.

I

Virginia Warden once worked as a housekeeper for 81-year-old Clarazetta Standen. The employment ended when Warden stole Standen's checkbook and cashed a $2,000 check on Standen's account. This incident resulted in Warden's conviction for forgery in July 1992. Warden, a woman of 41 years, had no prior criminal history.

On January 28, 1993, Warden disguised herself as a delivery person and knocked on Standen's door. Standen recognized Warden and invited her in. There was a brief discussion. A tenant of Standen's overheard Warden say, in a demanding voice, "Give me a check." Warden took a Mason jar from the kitchen counter and broke it over Standen's head. Standen fell to the floor, screaming. Warden found a butcher knife in a kitchen drawer and knelt down next to Standen, telling her to be quiet. As Standen continued to scream, Warden plunged the knife into her chest.

Standen's tenant locked herself in her room upon hear-

ing the screams and called 911. Warden tried to enter her room, but left when the tenant said she had called the police. After driving away from Standen's house, Warden stopped at a pay phone, called her mother and son, and told them she had killed someone. Her son told her to go to a hospital psychiatric ward. Warden arrived at Harborview Hospital about an hour later. Sobbing and distraught, she told emergency room attendants she had just killed someone. When police officers arrived, Warden waived her right to counsel and confessed to stabbing Standen.

The State charged Warden with first degree premeditated murder and alternatively with first degree felony murder with robbery as the underlying felony. The State's theory of the case was that Warden planned the killing in order to steal money from Standen. Earlier on the afternoon of the killing, Warden had called her mother and promised to bring her a check for $2,400. Warden had $74 in her bank account; she owed her mother over $6,000.

The defense theory was that post-traumatic stress disorder rendered Warden incapable of forming an intent to kill. Dr. John Liebert, a psychiatrist specializing in aggression and trauma, detailed Warden's history as a victim of abuse by her son. From the age of 10, the son routinely beat, threatened and intimidated his mother. In 1986, Warden was hospitalized after he threw a knife at her. In 1988, he broke his mother's hand. In 1991, he was arrested for attacking his mother with a fireplace poker. In 1992, he broke his mother's nose. Altogether, police reports documented 10 instances of domestic violence against Warden by her son.

Based on his conversations with Warden, Dr. Liebert believed these reported incidents of physical violence were "just the tip of an iceberg." Warden experienced ongoing verbal and psychological abuse as well. Warden worked two jobs to support her abusive son and would return home to cook dinner for him. She lived in constant fear that her son would beat her if she did not earn enough money to satisfy his demands. Warden slept only two or

three hours a night and sometimes slept in her car to avoid being beaten. Dr. Liebert testified that Warden demonstrated a "very, very high profile of dissociative experiences." She frequently had nightmares of her son dying.

Warden did not testify. Dr. Liebert presented the following account of Warden's behavior on the day of the killing, derived from his conversations with her. Warden was in "desperate financial circumstances," and she was "terrified" of not having enough money to please her son. As she drove home from work that afternoon, Warden was "losing it." She went to Standen's house because "she wanted to tell her how bad things were and how her life was ruined." When she entered Standen's home, Standen started screaming at Warden because Warden had taken her money. In Dr. Liebert's view, the victim's screaming was an "irrelevant cue" that set off a dissociative episode in Warden, causing her to disintegrate psychologically. He explained that a dissociative state is something that "gets the controls of your vehicle and takes over your personality for a period of time." Dr. Liebert also testified that Warden saw "imagery" at the time of the killing, including her own face, her son's face, and the face of her mother. Dr. Liebert's opinion was that Warden lacked the mental capacity to formulate the intent to kill.

At the close of trial, the court instructed the jury that it could take evidence of Warden's mental condition into account in determining whether she had an intent to kill. The court instructed the jury on first and second degree murder, but rejected Warden's proposed instructions on first and second degree manslaughter. In the trial court's view, the evidence established either that Warden formed the intent to kill or that she was unable to form any culpable intent at all. The trial court did not see the evidence as supporting an intermediate inference that Warden acted with recklessness or negligence.

During deliberations, the jury sent out a note asking, "May we consider finding the defendant guilty of accidental manslaughter, assault resulting in death, or some

other 'lesser crime.' If so may we have further information regarding the above." The court responded that the jury could consider only the crimes set forth in the instructions. The jury found Warden guilty of second degree murder.

## II

■ A defendant is entitled to an instruction on a lesser included offense if two conditions are met.

First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed.[1]

The parties agree the first prong of the *Workman* test is satisfied here. The issue is whether the diminished capacity evidence supports an inference that Warden committed manslaughter rather than murder.

Several Washington opinions have held that a defendant who raised a diminished capacity defense to a murder charge was entitled to an instruction on manslaughter.[2]

In *State v. Colwash*, the defendant presented evidence that he was intoxicated when he stabbed the victim to death with a knife. The trial court's refusal to give a manslaughter instruction was reversible error because it prevented the defendant from arguing his theory of the crime:

Without the manslaughter instruction, the jury was required to either find the defendant guilty of one of the degrees of murder or acquit him. It is unrealistic to believe that a jury would acquit the defendant under the facts presented. The refusal to give the manslaughter instruction disarmed the de-

---

[1]*State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978) (citations omitted).

[2]*State v. Colwash*, 15 Wn. App. 530, 550 P.2d 57 (1976), *aff'd*, 88 Wn.2d 468, 564 P.2d 781 (1977); *State v. Berge*, 25 Wn. App. 433, 607 P.2d 1247, *review denied*, 94 Wn.2d 1016 (1980); *State v. Jones*, 95 Wn.2d 616, 628 P.2d 472 (1981).

fendant of the theory that if he was guilty of any crime it was manslaughter, an unintentional killing, by reason of his intoxicated condition.[3]

In *State v. Berge*, the defendant faced charges of first and second degree murder after he fired 30 shots at a sleeping companion. Berge testified that as a result of his cocaine use on the night of the shooting, he thought the victim was a Russian KGB agent capable of draining his psychic energy and powers. Several experts testified that Berge suffered from "toxic paranoid psychosis."[4] The court held it was reversible error to refuse a first degree manslaughter instruction because Berge's psychosis may have negated his ability to form the intent to cause death.

In *State v. Jones*, there was evidence that the defendant was intoxicated when he stabbed the victim to death with a knife. The trial court instructed the jury that it could take Jones's intoxication into account in determining his mental state, but the court refused to instruct the jury on first degree manslaughter. The Supreme Court held this refusal was reversible error because it "prevented [Jones] from presenting his theory that the killing was unintentional by reason of his intoxication."[5]

The trial court here interpreted *Jones* as authorizing a manslaughter instruction only when self-defense is an issue, that is, where the homicide results from the defendant recklessly or negligently using more force than necessary to repel an attack.[6] *Jones* is not that limited.[7] Under *Jones*, *Berge*, and *Colwash*, evidence that the defendant lacked the intent to cause death ordinarily means that the defendant may have acted with a less culpable

---

[3]*Colwash*, 15 Wn. App. at 532.

[4]*Berge*, 25 Wn. App. at 435.

[5]*Jones*, 95 Wn.2d at 623.

[6]*See Jones*, 95 Wn.2d at 623.

[7]*See State v. Bergeson*, 64 Wn. App. 366, 372 n.3, 824 P.2d 515 (1992) ("*Jones* was decided on the basis of intoxication, not self-defense.").

mental state. Such evidence is sufficient, under the factual prong of *Workman*, to support the inference that the defendant committed manslaughter.

## III

The prior version of the manslaughter statute, reviewed in *Colwash*, defined manslaughter in catchall fashion as "Any homicide other than murder in the first degree, or murder in the second degree, and not being excusable or justifiable."[8] The modern statute distinguishes between first and second degree manslaughter. We now consider whether both manslaughter instructions are appropriate given the evidence in the case.

■ A person who "recklessly causes the death of another person" is guilty of first degree manslaughter.[9] A person acts recklessly who knows of and disregards a substantial risk that a wrongful act may occur and whose disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.[10] The inference needed to support a first degree manslaughter instruction is that the defendant caused the victim's death "*without intent to kill, but with recklessness.*"[11]

In both *Jones*, a stabbing case, and *Berge*, a shooting case, the failure to instruct on first degree manslaughter was reversible error. Each of those cases implicitly held that evidence of intoxication supported an inference that the defendant acted recklessly, rather than intentionally. We see no rationale for a different result where the diminished capacity results from a "dissociative episode" rather than intoxication. The jury could reasonably find that Warden, while not intending to kill, knew of and disregarded the risk that her actions would cause injury.

---

[8]*Colwash*, 15 Wn. App. at 532 (quoting former RCW 9.48.060).

[9]RCW 9A.32.060(1)(a).

[10]RCW 9A.08.010(1)(c).

[11]*Bergeson*, 64 Wn. App. at 373.

■ A person is guilty of manslaughter in the second degree "when, with criminal negligence, he causes the death of another person."[12] A person acts with criminal negligence "when he fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation."[13]

Because criminal negligence is based on an objective "reasonable person" standard, a person may be criminally negligent despite an impairment in mental capacity. Indeed, a defendant may not raise the issue of diminished capacity in defense against a charge of second degree manslaughter.[14] The jury could accept Dr. Liebert's testimony that Warden lacked the capacity to formulate an intent to kill and still conclude that Warden's act was a gross deviation from the reasonable course of conduct.[15]

We conclude that the trial court should have instructed the jury on both first and second degree manslaughter. The trial court's refusal to give the manslaughter instructions requires reversal of Warden's conviction.[16]

## IV

We briefly address Warden's assignments of error concerning her exceptional sentence, as these issues may arise again following retrial.

■ The trial court imposed an exceptional sentence of 240 months, 35 months over the top of the standard range for Warden's offense. The evidence supports the court's finding that Standen's age and physical condition made

---

[12]RCW 9A.32.070(1).

[13]RCW 9A.08.010(1)(d).

[14]*See State v. Coates*, 107 Wn.2d 882, 892-93, 735 P.2d 64 (1987).

[15]*See Coates*, 107 Wn.2d at 893; *see also State v. Collins*, 30 Wn. App. 1, 12-15, 632 P.2d 68, *review denied*, 96 Wn.2d 1020 (1981).

[16]*Jones*, 95 Wn.2d at 623.

her particularly vulnerable to the attack.[17] Standen was 81 years old and unsteady on her feet. A more able-bodied person would likely have been able to escape or somehow fend off the attack before being killed.

■ Warden contends the court erred in considering her "future dangerousness" at sentencing.[18] The trial court recognized that society's need for protection could not be a basis for an exceptional sentence, but considered it in determining the *length* of Warden's exceptional sentence. This was not an abuse of discretion.[19]

Reversed.

COLEMAN and GROSSE, JJ., concur.

Review granted at 129 Wn.2d 1019 (1996).

---

[17]*See* RCW 9.94A.390(2)(b).

[18]*See State v. Barnes*, 117 Wn.2d 701, 703, 818 P.2d 1088 (1991).

[19]*State v. Ross*, 71 Wn. App. 556, 568, 861 P.2d 473, *as amended*, 883 P.2d 329, *review denied*, 123 Wn.2d 1019 (1994).