# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

STATE OF WASHINGTON,

                    Respondent,

          v.

DIEGO TAVARES,

                    Appellant.

No. 77004-7-I

ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION

The appellant, Diego Tavares, has filed a motion for reconsideration of the opinion filed on June 17, 2019, and the State has filed a response. The court has determined that the motion should be denied, but the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on June 17, 2019 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Respondent,

          v.

DIEGO TAVARES,

          Appellant.

No. 77004-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 26, 2019

APPELWICK, C.J. — Tavares appeals his conviction for first degree murder of Camacho Vergara. He argues that the State failed to prove beyond a reasonable doubt that he had premeditated intent to kill Camacho Vergara. He further asserts that the trial court erred in not instructing the jury on second degree manslaughter, excluding certain evidence under ER 404(b), and improperly commenting on the evidence through a jury instruction. He also argues that cumulative error deprived him of his right to a fair trial. Finally, he challenges the trial court's imposition of certain legal financial obligations. We affirm Tavares's conviction, but remand to the trial court to strike the criminal filing fee and reconsider the imposition of the DNA collection fee.

## FACTS

On December 11, 2015, Gloria Hernandez hosted a party at her house in Everett. She lived there with her husband, daughter-in-law, granddaughter, and five children, including her son, Iseiah Hernandez. About 10 of Iseiah's[1] friends

---

[1] We refer to Iseiah Hernandez by his first name for clarity.

attended the party. Some of the people who attended the party were associated with two allied gangs, "Wet Back Pride" (WBP) and "Los Angeles Crazies" (LAC). Those people included Jose Silva-Padilla, the "shot caller"[2] of WBP.

Anthony Camacho Vergara was one of Iseiah's friends at the party. In the early morning hours of December 12, Camacho Vergara, Iseiah, and a few other people went from the house to the garage to smoke marijuana. After Camacho Vergara smoked marijuana, he decided to go outside and "take a breather." About 45 seconds later, the people in the garage heard three pounding noises. They went outside and found Camacho Vergara laying in front of Iseiah's truck. He was unresponsive and had blood on his forehead.

Partygoers placed Camacho Vergara in a car and drove him to the hospital, where he died. The Snohomish County Chief Medical Examiner determined that his cause of death was a penetrating gunshot wound to the head.

Earlier on December 11, Edgar Calixto, a member of the "Sur Town Rascals" (STR) gang, was driving around Everett with two other people, Christian Guzman and Irvin Martinez-Lopez. The three had been smoking marijuana and methamphetamine, and later met up with Guillermo Padilla, a member of the "Desmadrosos" (DSM) gang. The STR and DSM gangs were friendly with one another. Padilla told them about a party on Casino Road that WBP might attend. Casino Road used to be WBP and LAC's area, and STR and DSM were trying to take it over. WBP and LAC were rivals of STR and DSM.

---

[2] The "shot caller" is the person in charge.

2

After meeting with Padilla, Calixto was driving with Guzman and Martinez-Lopez when he saw Diego Tavares, another STR member. Tavares and another person then got in Calixto's car. They eventually headed to the Casino Road party at the Parkridge Apartments. Calixto and Padilla both testified that they went there to cause trouble. Padilla testified, "[W]ell, all of us had guns and we went to find rivals. If we found them, shoot at them." When they arrived at the party, they walked behind the apartment where the party was, and everyone ran out. They chased the people who ran out, thinking they were WBP members. They then ran back to the car when they heard a siren, and Padilla dropped Tavares and Guzman off at a McDonald's.

Later, around 11:00 p.m., Calixto and Martinez-Lopez were smoking methamphetamine together in a parking lot when Calixto got a Facebook call from Tavares. Tavares told him that he had just been chased by WBP and LAC members, they had a gun, and they were trying to shoot him. Calixto told Martinez-Lopez to call Padilla, because Padilla had another gun. Calixto already had a gun with him. They picked up Padilla, who brought his gun. They picked up Tavares next. Martinez-Lopez testified that Tavares "looked high" and appeared angry. He testified that Tavares mentioned something about a house party at Iseiah's, which he had seen on Facebook. According to Calixto, Tavares said, "I'm trying to go get these fools."

They drove to the party, and, according to Martinez-Lopez, drove by Iseiah's backyard. Martinez-Lopez, Calixto, and Padilla all testified that Tavares saw people in the backyard, or on the back porch. According to Padilla, Tavares said

3

"that's them" when he saw people on the back porch, and told them to turn back. Calixto then pulled his car into the next street.

Martinez-Lopez, Calixto, and Padilla all testified that, once they parked, Tavares asked Calixto for his gun. Calixto would not give him his gun and told Tavares to take Padilla's gun. According to Martinez-Lopez and Calixto, Tavares then asked Padilla for his gun, and Padilla gave it to him. Calixto testified that Padilla told Tavares the gun was already "cocked back" and "on safety," and to click the safety off when he wanted to shoot. Padilla denied telling Tavares how the gun worked. He testified that Tavares grabbed his gun and got out of the car.

Martinez-Lopez and Calixto testified that, once Tavares got out of the car, he walked in the direction of Iseiah's house. Then, Martinez-Lopez, Calixto, and Padilla heard gunshots, and saw Tavares running back to the car.[3] Once Tavares got back in the car, Calixto drove away. According to Calixto, Tavares told him that "he saw a spark when he shot the bullet," and "[w]hen he hit the garage door, he saw a spark." According to Martinez-Lopez and Padilla, Tavares also said he "saw a body drop."

Calixto testified that he later met up with Padilla, who told him that everyone on Facebook was saying Camacho Vergara got shot. Calixto knew who Camacho Vergara was, and had heard he was a member of WBP or LAC at the time.

---

[3] Martinez-Lopez testified that he heard three gunshots, Calixto testified that he heard two to three gunshots, and Padilla testified that he heard three to four gunshots.

The day of the shooting, Tavares spoke with his sister. She testified that he told her someone had been following him the night before. He told her that someone had been trying to shoot at him, and that he then went after them and tried shooting at them.

Tavares spoke with his father the day after the shooting. He testified that Tavares told him about an incident where he was shot at and chased by two or three cars. He told him that the people chasing him seemed like they were from Casino Road, and that he hid until they left. Tavares also told him that, after hiding, he contacted his friends through Facebook and asked them to pick him up, which they did.

The State charged Tavares with first degree murder of Camacho Vergara, and second degree unlawful possession of a firearm. The State also charged Calixto and Padilla with first degree murder. Calixto and Padilla pleaded guilty to second degree murder, and agreed to testify at trial.

Prior to trial, Tavares sought to admit evidence of prior bad acts by Calixto and Padilla, arguing that the evidence was admissible to prove motive, intent, preparation, and plan under ER 404(b). The State sought to exclude that evidence as inadmissible propensity evidence under ER 404(a).

The court excluded evidence that Padilla (1) received the nickname "Triggerz" because he was known for shooting at other people, (2) went to a fall 2015 party attended by WBP members with the intention of shooting at rival gang members, kicked open the door, and fired several rounds inside, (3) shot at a car occupied by rival gang members in 2015, resulting in the car crashing, and (4) shot

at a rival gang member or members on at least one other occasion. The trial court also excluded evidence that Calixto (1) shot at people to prove himself for admission to STR, (2) shot at a car leaving a party attended by rival gang members in Shoreline, and (3) once shot a weapon into the air to scare rival gang members.

At trial, the court instructed the jury on the lesser included offenses of second degree murder and first degree manslaughter, but did not instruct the jury on second degree manslaughter. Tavares took exception to the court's failure to give a second degree manslaughter instruction.

The jury found Tavares guilty of first degree murder, but not guilty of second degree unlawful possession of a firearm. The trial court sentenced him to 25 years in prison. The court also imposed legal financial obligations, including a $200 criminal filing fee and a $100 biological sample fee. Tavares appeals.

## DISCUSSION

Tavares makes six arguments. First, he argues that the evidence was not sufficient to prove that he or an accomplice had premeditated intent to kill Camacho Vergara. Second, he argues that the trial court erred in not instructing the jury on second degree manslaughter. Third, he argues that the court's exclusion of certain evidence under ER 404(b) deprived him of his right to present a complete defense. Fourth, he argues that the court improperly commented on the evidence. Fifth, he argues that cumulative error deprived him of his right to a fair trial. And, sixth, he argues that his criminal filing fee and DNA (deoxyriboneucleic acid) collection fee should be stricken.

I. Sufficiency of Evidence

Tavares argues first that the State failed to prove that he committed first degree murder. He asserts that the jury instructions required proof of premeditated intent to cause the death of Camacho Vergara specifically, not the death of "another person." He further asserts that, whether the jury found him guilty as a principal or an accomplice, the evidence did not prove liability under the jury instructions.

The sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id. Circumstantial and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. See State v. Johnston, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).

Premeditation must "involve more than a moment in point of time." RCW 9A.32.020(1). To establish premeditation, the State must show "the deliberate formation of and reflection upon the intent to take a human life," which "involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Hoffman, 116 Wn.2d 51,

7

82-83, 804 P.2d 577 (1991). "Premeditation can be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict is substantial." Id. at 83.

Here, the jury instructions provide,

> To convict the defendant of the crime of murder in the first degree as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 12th day of December, 2015, the defendant, or a person to whom the defendant was an accomplice, acted with intent to cause the death of Anthony Camacho Vergara;
>
> (2) That the intent to cause the death was premeditated;
>
> (3) That Anthony Camacho Vergara died as a result of the defendant's acts or the acts of an accomplice to the defendant; and
>
> (4) That any of these acts occurred in the State of Washington.

The first degree murder statute, RCW 9A.32.030, does not require the defendant to have acted with premeditated intent to cause the death of a named person. See RCW 9A.32.030(1)(a). Rather, it requires the defendant to have acted with premeditated intent to cause the death of "another person." RCW 9A.32.030(1)(a).

Here, the "to convict" instruction required the State to prove that either Tavares or an accomplice acted with intent to cause the death of Camacho Vergara, and that the intent was premeditated. The State did not object to the instruction. Under the law of the case doctrine, jury instructions not objected to become the law of the case. State v. Hickman, 135 Wn.2d 97, 101-02, 954 P.2d 900 (1998). "In criminal cases, the State assumes the burden of proving otherwise

8

unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction." Id. at 102. As a result, Tavares argues that the State took on the added burden of proving premeditated intent to cause the death of Camacho Vergara, not simply the death of "another person."

The State argues that, under the jury instructions, it was not necessary for Tavares to know the identity of the specific person that he killed. Relying on State v. Tyler, 191 Wn.2d 205, 422 P.3d 436 (2018), it asserts that the to convict instruction allowed it to prove that Tavares had premeditated intent to cause the death of either Camacho Vergara or another person.

In Tyler, the to convict instruction required the State to prove that "'the defendant knowingly received, retained, possessed, concealed, disposed of a stolen motor vehicle.'" 191 Wn.2d at 209. A separate definitional instruction inserted the word "'or'" before "'disposed of a motor vehicle.'" Id. at 216. On appeal, Tyler argued that the instruction required the jury to find he committed all the acts that constituted possession: "'received, retained, possessed, concealed, [and] disposed of a motor vehicle.'" Id. The State Supreme Court rejected his argument. Id. Viewing the instructions as a whole, it found that the definitional instruction set forth clarifying language, using the disjunctive "'or.'" Id. at 217. And, it noted that Tyler's argument would require the court to read the word "'and'" into the instruction. Id. at 218.

The to convict instruction here does not contain an ambiguity in need of clarification. Rather, the State's argument would require us to strike specific

language from the to convict instruction which would broaden the meaning of the instruction. Tyler does not control, Hickman does. See 135 Wn.2d at 102.

Tavares argues that the evidence is insufficient to prove he had premeditated intent to cause Camacho Vergara's death. He contends that evidence that he had premeditated intent to kill rival gang members does not prove he had premeditated intent to kill Camacho Vergara specifically.

Padilla testified that LAC members shot at Tavares before the shooting. Calixto testified that Tavares said something about "trying to go get them." Martinez-Lopez testified that Tavares mentioned something about a house party at Iseiah's. And, Martinez-Lopez, Calixto, and Padilla all testified that Tavares walked towards Iseiah's house with a gun, they heard gunshots, and Tavares came running back.

But, importantly, both Calixto and Tavares knew Camacho Vergara. When asked if he knew Camacho Vergara to be in a gang, Calixto testified that he "heard he was in a gang around that time." He also testified that he knew who Camacho Vergara was, and that he had known him since middle school. Specifically, he testified that he had heard Camacho Vergara was from WBP, and that somebody else told him he was from LAC. Tavares and Calixto were members of STR, and Padilla was a member of DSM. STR and DSM were rivals of WBP and LAC.

There is also testimony that Tavares knew Camacho Vergara, and that they were friends. Oscar Barrientos Maciel, Tavares's cousin, testified that Tavares and Camacho Vergara were "pretty good friends" when Barrientos Maciel was in

10

high school with Camacho Vergara. Barrientos Maciel did not know if the two had any problems around the time Camacho Vergara was shot.

Viewing this evidence in a light most favorable to the State, a reasonable jury could find that Tavares had premeditated intent to kill Camacho Vergara specifically.

Tavares argues next that the verdicts establish the jury rejected the theory that he was the principal who shot Camacho Vergara. He points out that although the jury convicted him of first degree murder, it found him not guilty of unlawful possession of a firearm. Therefore, he argues that this court cannot affirm on a theory that the evidence proved principal liability under the instructions. He states that the "validity of the conviction turns on accomplice liability."[4]

---

[4] Relying on State v. Dreewes, 2 Wn. App. 2d 297, 409 P.3d 1170 (2018), reversed in part, 192 Wn.2d 812, 432 P.3d 795 (2019), Tavares also argues that the evidence was insufficient to convict him as an accomplice because he did not have actual knowledge of the crime as set out in the to convict instruction. However, Dreewes does not control. In Dreewes, the issue was whether the State had to prove that Dreewes had actual knowledge that she was promoting or facilitating assault in the second degree against the named victim to establish accomplice liability. Id. at 323-24. The court found that it did, and determined that the evidence was insufficient to support that Dreewes acted with actual knowledge that she was promoting or facilitating an assault against the victim. Id. at 324. The State Supreme Court reversed the Court of Appeals on this issue, holding that it was enough that Dreewes had general knowledge of her coparticipant's substantive crime. Dreewes, 192 Wn.2d at 825-26, 831. Here, the State had the burden of proving that either Tavares or someone to whom he was an accomplice had premeditated intent to cause Camacho Vergara's death. The State met its burden of proving that Tavares had premeditated intent.

11

In the context of premeditated first degree murder by accomplices, "the law of accomplice liability allows the jury to reach a conviction by splitting the elements of premeditated first degree murder between accomplices." State v. Walker, 182 Wn.2d 463, 483, 341 P.3d 976 (2015).

> A conviction based on split elements may be affirmed "[s]o long as the State proved beyond a reasonable doubt to the satisfaction of all of the jurors that at least one of the participants [had the requisite intent] and at least one but not necessarily that same participant [committed the criminal act]."

Id. (alteration in original) (quoting State v. Haack, 88 Wn. App. 423, 429, 958 P.2d 1001 (1997)).

In a special verdict form that asked whether Tavares was armed with a firearm at the time of the murder, the jury answered "no." The to convict instruction required the jury to find that Camacho Vergara died "as a result of the defendant's acts or the acts of an accomplice to the defendant." It also required the jury to find that Tavares, or someone to whom he was an accomplice, acted with premeditated intent to cause the death of Camacho Vergara. Thus, regardless of whether Tavares was the shooter, the jury still had to find that either he or another participant had premeditated intent to kill Camacho Vergara.

The State first points to Padilla's testimony that, before the shooting, LAC members shot at Tavares. Calixto testified that Tavares said something about "trying to go get them," and specifically said, "'I'm trying to go get these fools.'" Martinez-Lopez testified that Tavares mentioned a house party at Iseiah's that he had seen on Facebook.

The State next points to Padilla's testimony that, while driving, Tavares saw people and said "that's them." According to Martinez-Lopez, Calixto, and Padilla, Tavares then walked away from the car with a gun, they heard gunshots, and Tavares came running back. Tavares's sister testified that later, he told her that people had tried shooting at him, and that he went after them and tried shooting at them.

The State last points to Calixto's testimony that he heard Camacho Vergara was in a gang around that time. As established above, Calixto knew who Camacho Vergara was, and knew he was from WBP or LAC. And, Barrientos Maciel testified that Tavares and Camacho Vergara knew each other and were friends.

Viewing this evidence in a light most favorable to the State, a reasonable jury could find that Tavares and Calixto knew Camacho Vergara's identity, knew that he was a member of LAC or WBP, and knew LAC and WBP members would be at the party. It could find that Tavares, Calixto, and Padilla planned to shoot LAC and WBP members in retaliation for shooting at Tavares. Specifically, it could find that they went to Isaiah's home intending to shoot members of those gangs, that one or more of them spotted LAC or WBP members outside the house, and that one or more of them left the car armed, spotted Camacho Vergara, and shot him. Among the participants, all of the elements of the crime are supported by substantial evidence. Under Walker, even though the jury found that Tavares was not armed during the murder, it could properly find that Tavares was an accomplice to the premeditated murder of Vergara.

The evidence is sufficient to allow a jury to conclude that Tavares was an accomplice and that he or another accomplice had premeditated intent to cause Camacho Vergara's death.

## II.    Lesser Included Offense Instruction

Tavares argues second that the trial court erred in not instructing the jury on the lesser included offense of second degree manslaughter. At trial, Tavares took exception to the court's failure to give a second degree manslaughter instruction.

When a defendant is charged with an offense, the jury may find the defendant guilty of an offense that is necessarily included within that with which he or she is charged. RCW 10.61.006. Under State v. Workman, a defendant is entitled to an instruction on a lesser included offense if two elements are met. 90 Wn.2d 443, 447, 584 P.2d 382 (1978). First, each of the elements of the lesser offense must be an element of the offense charged. Id. at 447-48. Second, the evidence must support an inference that the lesser crime was committed. Id. at 448. Second degree manslaughter is a lesser included offense of first degree murder. See State v. Collins, 30 Wn. App. 1, 15, 632 P.2d 68 (1981) ("[M]urder would include manslaughter in the first and second degrees; they are not inconsistent mental states."). Thus, the outcome of this issue turns on the second, factual prong.

When substantial evidence in the record supports a rational inference that the defendant committed only the lesser included or inferior degree offense to the exclusion of the greater offense, the factual component of the test for entitlement

14

to an inferior degree offense instruction is satisfied. State v. Fernandez-Medina, 141 Wn.2d 448, 461, 6 P.3d 1150 (2000). The evidence must be viewed in the light most favorable to the party requesting the instruction. Id. at 455-56. To satisfy the factual prong, the evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt. Id. at 456. We review the decision not to give a lesser included offense instruction for an abuse of discretion. See State v. Picard, 90 Wn. App. 890, 902, 954 P.2d 336 (1998).

The trial court instructed the jury on first degree manslaughter, which is committed by recklessly causing the death of another person. RCW 9A.32.060(1)(a). "Recklessness" requires that a person "know[] of and disregard[] a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).

A person is guilty of second degree manslaughter "when, with criminal negligence, he or she causes the death of another person." RCW 9A.32.070(1). A person acts with criminal negligence when "he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

Tavares argues that there was evidence indicating the shooter did not see Camacho Vergara, and that Camacho Vergara was at an unexpected place when the shooting happened. He also argues that the evidence showed that Tavares,

Calixto, Martinez-Lopez, and Padilla were high at the time of the shooting. Viewing the evidence together, Tavares contends that a jury could have rationally concluded that he was unaware of a substantial risk of causing the death of a person by firing at vehicles or a garage 25 feet away from the house. He relies on State v. Warden, 80 Wn. App. 448, 909 P.2d 941 (1996), aff'd, 133 Wn.2d 559, 947 P.2d 708 (1997).

In Warden, this court determined that evidence of Warden's diminished capacity due to a dissociative episode supported an inference that she acted either recklessly or negligently. 80 Wn. App. at 455-56. At trial, a psychiatrist had testified about Warden's history as a victim of abuse, and offered his opinion that Warden lacked the mental capacity to formulate the intent to kill. Id. at 451-52. The trial court instructed the jury that it could take evidence of Warden's mental condition into account in determining whether she had intent to kill. Id. at 452.

This court found that evidence that a defendant lacks the intent to cause death is sufficient, under Workman's factual prong, to support an inference that the defendant committed manslaughter. Id. at 455. Therefore, it held that the trial court should have instructed the jury on both first and second degree manslaughter. Id. at 456. In doing so, the court relied on two cases where evidence of intoxication supported an inference that the defendant acted recklessly, State v. Jones, 95 Wn.2d 616, 628 P.2d 472 (1981), and State v. Berge, 25 Wn. App. 433, 607 P.2d 1247 (1980). Id. at 455.

16

In Jones, the victim was stabbed several times after a struggle ensued between him and the defendant. 95 Wn.2d at 618. Jones testified at trial that he had drunk 9 or 11 beers before the incident, and a witness who talked to him after the incident "'thought possibly he had been drinking.'" Id. at 622. Another witness who talked to Jones before the incident noticed that the whites of his eyes were red and his speech was slurred. Id. And, soon after the crime, police placed Jones in the "'drunk tank'" at the police station. Id.

In Berge, the defendant shot and killed the victim as he slept in Berge's living room. 25 Wn. App. at 434. At trial, Berge testified that, before the shooting, he had voluntarily ingested cocaine. Id. And, three defense psychiatrists concluded that Berge suffered from a toxic paranoid psychosis at the time of the shooting. Id. at 434-35. In both Jones and Berge, the trial court instructed the jury that it could consider the defendant's intoxication. Jones, 95 Wn.2d at 622; Berge, 25 Wn. App. at 439.

Warden, Jones, and Berge are distinguishable. The only evidence of Tavares's intoxication at the time of the shooting was testimony by Martinez-Lopez, Calixto, and Padilla that he appeared high. No evidence established a factual basis for intoxication or an alleged diminished mental capacity. No expert testimony was presented. This is not substantial evidence that Tavares was incapable of appreciating the substantial risk that firing a gun would cause the death of another person. And, unlike each case cited, the trial court was not asked to give and did not give an instruction permitting the jury to consider alleged

17

intoxication or diminished mental capacity. The trial court did not abuse its discretion in failing to instruct the jury on second degree manslaughter.

Even if the trial court had erred in not providing a second degree manslaughter instruction, the error would be harmless. Tavares cites State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015), for the proposition that the erroneous denial of a defendant's request for the jury to be instructed on a lesser offense requires reversal. The Condon court relied on State v. Parker, 102 Wn.2d 161, 683 P.2d 189 (1984), for that proposition. 182 Wn.2d at 326.

In Parker, the State Supreme Court held that the trial court committed prejudicial error in failing to instruct on the lesser included offense of reckless driving. 102 Wn.2d at 166. The jury had been instructed on felony flight, and no lesser included offense. Id. at, 163, 166. The Court of Appeals had presumed from the jury's guilty verdict that the jury rejected Parker's intoxication defense, and that a retrial would not produce a different result. Id. But, the State Supreme Court found that "the jury had no way of using the intoxication evidence short of outright acquitting Parker, because they were never told that the option of the lesser-included offense existed." Id. It clarified, "This court . . . has never held that, where there is evidence to support a lesser included offense instruction, failure to give such an instruction may be harmless." Id. at 164.

Unlike Parker, the jury here was not presented with an all or nothing choice. The trial court instructed the jury on intermediate offenses, the lesser crimes of second degree murder and first degree manslaughter. The jury verdict finding premeditated intent necessarily rejected a finding of intent without premeditation

or a finding of recklessness. Had the jury believed that Tavares was less culpable because he was intoxicated, logically it would have returned a verdict on the lesser offenses of second degree murder or first degree manslaughter. See State v. Hansen, 46 Wn. App. 292, 298, 730 P.2d 706, 737 P.2d 670 (1986). "Any error in failing to instruct on a lesser included offense does not require reversal if the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." Id. at 297. Such is the case here. Any error was harmless.

## III. Other Suspect Evidence and ER 404(b)

Tavares argues third that the trial court's exclusion of other suspect evidence deprived him of his right to present a complete defense. He asserts that evidence of Calixto and Padilla's prior bad acts was relevant to show that they had the motive, intent, and ability to commit the offense, pursuant to ER 404(b).[5]

---

[5] The State argues that Tavares has not preserved this issue for appeal. Before trial, the State asked the court to clarify that certain evidence regarding Calixto and Padilla was inadmissible. At that time, Tavares renewed his motion to admit evidence of their prior bad acts. The court ruled that the evidence of prior bad acts was inadmissible. Next, the court addressed certain character and reputation evidence that the State moved to exclude. The court ruled, "So at this point I'm granting the State's motion, but if the defense feels that the door has been opened or it's appropriate given the evidence, then we'll take that up outside the presence of the jury." The State argues that this ruling was tentative and Tavares should have renewed his request to admit the evidence. "[T]he purpose of a motion in limine is to avoid the requirement that counsel object to contested evidence when it is offered during trial." State v. Powell, 126 Wn.2d 244, 256, 893 P.3d 615 (1995). Unless the court indicates that further objections are required, the losing party is deemed to have a standing objection where a judge has made a final ruling on the motion. Id. The court's ruling addressed character and reputation evidence, not evidence of prior bad acts. And, the court did not indicate that Tavares would have to renew his motion to preserve the issue. Tavares preserved the issue for appeal.

As to Padilla, the trial court found that evidence that he kicked open a door and fired shots into a party with WBP members did not show motive in this case. It stated, "[The evidence] is not indicative of a generalized plan to shoot rival gang members without any particular provocation and did not particularly show motive or intent." The court found that evidence that Padilla shot at a car with rival gang members inside did not show motive here. It also found that evidence that he shot at rival gang members another time was inadmissible propensity evidence. And, it found that evidence that he got his nickname because he was known for shooting at people was inadmissible propensity evidence.

As to Calixto, the trial court found that evidence that he shot at people to prove himself for admission into STR was inadmissible propensity evidence, and did not show motive or intent. It found that evidence that he shot at a car leaving a party attended by rival gang members was "pretty vague." It stated, "I don't know when that was supposed to have occurred and, again, it doesn't, to me, seem to present any motive or intent." The court reached the same conclusion regarding evidence that Calixto once shot a weapon in the air to scare rival gang members.

Relying primarily on State v. Arredondo, 188 Wn.2d 244, 394 P.3d 348 (2017), Tavares argues that this evidence was "highly probative on the issue of motive and intent." There, the State Supreme Court held that the trial court properly admitted evidence under ER 404(b) that Arredondo, a gang member, was involved in a previous drive by shooting with a particular rival gang. 188 Wn.2d at 249, 251-52, 263. The trial court held that the incident could be used for motive and intent. Id. at 259. The victim in the case died from a gunshot wound, and was

20

a member of the same rival gang. Id. at 250-51. The court stated that the evidence was particularly relevant because the witnesses were unwilling to speak freely. Id. at 259. It stated, "A jury would need to glean motive and intent through other means." Id.

Arredondo argued that the evidence was irrelevant to show motive because the gang nature of the shooting was never in dispute. Id. But, the court noted,

> [E]vidence of a prior drive-by shooting is relevant to assess Arredondo's culpability in the December shooting because it demonstrates Arredondo's particular motive in reacting violently toward Avila, Vasquez, Rodarte, and Castillo for the simple offense of being Sureños at a Norteño party—i.e., a deep-seated animosity toward Sureños. This animosity goes beyond the routine friction between gangs, or even the "history of bad blood" between these particular gangs.

Id. The court clarified that "[e]vidence is 'relevant' if it makes the existence of a fact of consequence more or less probable to be true than without the evidence." Id.

The court also found that the trial court reasonably balanced the substantial prejudicial effect of evidence of the drive by shooting against its substantial probative value. Id. at 264-65. It determined that, "[g]iven the apparent code of silence between the witnesses, perpetrators, and victims, the probative value of evidence demonstrating Arredondo's motive to attack Avila and his passengers with an intent to kill or inflict great bodily harm would be particularly high here." Id. at 264.

Like <u>Arredondo</u>, Tavares argues that evidence that Padilla once shot into an apartment where WBP members were partying shows a deep-seated animosity between his gang, DSM, and WBP. But, here, Padilla's motives were not in dispute. There was overwhelming untainted evidence of Calixto's and Padilla's motives. They both testified about their rivalry with WBP and LAC, their intent to cause trouble at a WBP party the night of the shooting, and Padilla's intent to shoot at rival gang members.

The remainder of the excluded evidence did not identify which rival gangs were involved. Thus, the evidence did not go to motive and intent in this case, where Tavares told Calixto that he had been chased and shot at by WBP and LAC members specifically. The trial court did not abuse its discretion in excluding evidence of Calixto and Padilla's prior bad acts.[6]

---

[6] On reconsideration, Tavares argues that that this court overlooked his claim that the trial court violated his Sixth Amendment right to present a complete defense. We did not. He contends that just because the trial court did not abuse its discretion under ER 404(b) does not mean that there was no violation of his constitutional right. Under the Sixth Amendment, no state interest can be compelling enough to preclude the introduction of evidence of high probative value. <u>State v. Jones</u>, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). But, we necessarily concluded that the evidence is not of high probative value when we held that the trial court properly balanced the substantial prejudicial effect of the evidence at issue against its low probative value. If the evidence is not of high probative value, the trial court proceeds with the balancing test. And, because the trial court did not abuse its discretion applying the balancing test, there is no constitutional violation. <u>See</u> <u>State v. Blair</u>, 3 Wn. App. 2d 343, 353, 415 P.3d 1232 (2018) ("When a defendant argues that an adverse evidentiary ruling violates the right to a fair trial or the right to confrontation, it does not change the standard of review. If the trial court did not abuse its discretion, the inquiry ends. There is no error.").

22

IV.    Accomplice Testimony Instruction

Tavares argues fourth that the trial court improperly commented on the evidence through a jury instruction on accomplice testimony.  He asserts that the instruction told the jury that Calixto and Padilla were accomplices of Tavares, which was a contested factual issue.

Under article IV, section 16 of the Washington State Constitution, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."  This provision prohibits a judge from "conveying to the jury his or her personal attitudes toward the merits of the case" or instructing a jury that "matters of fact have been established as a matter of law."  State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997).  We review jury instructions de novo.  State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

The challenged instruction provides,

> Testimony of an accomplice, given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

Tavares concedes that this is the language offered by 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 6.05, at 197 (4th ed. 2016).  He also acknowledges that the instruction has been approved by the State Supreme Court in State v. Carothers, 84 Wn.2d 256, 525 P.2d 731 (1974).  But, he asserts that "whether an instruction is a comment on the evidence depends on the facts and circumstances of each case."  Relying on State v. Painter, 27 Wn.

23

App. 708, 620 P.2d 1001 (1980), he argues that the instruction should have used the language "'alleged accomplice'" or "'codefendant.'".

In Painter, the trial court instructed the jury that "'[h]omicide is justifiable when . . . the slayer has reasonable ground to believe that the person slain intends to inflict death or great bodily harm.'" Id. at 711. The instructions defined "'great bodily harm'" as "'an injury of a more serious nature than an ordinary striking with the hands or fists. It must be an injury of such nature as to produce severe pain and suffering.'" Id. The State Supreme Court had previously found that a similar definition of "great bodily harm" was not a comment on the evidence. See id. at 714. But, in Painter, the only evidence from which "the jury could find a justifiable homicide was a threatened striking with hands or fists." Id. The State Supreme Court determined that by restricting the definition as it did, "the trial court clearly indicated to the jury that the evidence presented at trial was insufficient to support the theory of self-defense."[7] Id. Thus, it held that the instruction constituted an impermissible comment on the evidence. Id.

Painter is distinguishable. The challenged instruction here did not indicate to the jury that the evidence at trial was insufficient to support Tavares's theory of the case. In contrast, it instructed the jury that the testimony of "an accomplice" offered by the State "should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution." The instruction did not identify Calixto and Padilla as accomplices. And, Tavares does

---

[7] The court also determined that the instruction defining "great bodily harm" did not accurately state the law. Id.

24

not argue that the instruction was an inaccurate statement of the law. He does not cite other authority to support that the instruction did not "make the law of accomplice liability manifestly clear," or that it "effectively told the jurors that Mr. Padilla and Calixto were accomplices of Mr. Tavares."

The trial court did not improperly comment on the evidence.

## V. Cumulative Error

Tavares argues fifth that that cumulative error deprived him of his right to a fair trial.

The cumulative error doctrine applies "when a combination of trial errors denies the accused a fair trial, even when any one of the errors taken individually would be harmless." State v. Salas, 1 Wn. App. 2d 931, 952, 408 P.3d 383, review denied, 190 Wn.2d 1016, 415 P.3d 1200 (2018). "The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." In re Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). If the evidence is overwhelming against a defendant, there is no prejudicial error. Id. at 691.

Tavares has not shown any error. Therefore, the cumulative error doctrine does not apply.

## VI. Legal Financial Obligations

Tavares argues last that his $200 criminal filing fee and $100 DNA collection fee should be stricken. Relying on House Bill 1783[8] and State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), he argues that the criminal filing fee cannot be imposed on indigent defendants. He further contends that it is improper to impose the DNA collection fee if the defendant's DNA has been collected as a result of a prior conviction.

In Ramirez, the State Supreme Court held that House Bill 1783 applies prospectively to cases on appeal. 191 Wn.2d at 747. House Bill 1783 amends RCW 36.18.020(2)(h) and prohibits courts from imposing the $200 filing fee on defendants who are indigent at the time of sentencing. See LAWS OF 2018, ch. 269, § 17(2)(h). It also amends RCW 43.43.7541, providing that the $100 DNA collection fee is not mandatory where "the state has previously collected the offender's DNA as a result of a prior conviction." Id. § 18.

The State concedes that the $200 filing fee should be stricken. At Tavares's sentencing, the trial court suspended the crime lab fee due to his indigency. But, because the record fails to indicate whether Tavares's DNA had already been taken, it argues that the $100 DNA fee remains mandatory. It relies on State v. Thibodeaux, 6 Wn. App. 2d 223, 430 P.3d 700 (2018), review denied, 192 Wn.2d 1029, 435 P.3d 278 (2019).

---

[8] ENGROSSED SUBSTITUTE H.B. 1783, §§ 17(2)(h), 18, 65th Leg., Reg. Sess. (Wash. 2018) (House Bill 1783).

In Thibodeaux, the record did not establish that the State had already collected Thibodeaux's DNA. Id. at 230. As a result, this court found that Thibodeaux failed to demonstrate that it was impermissible to impose the collection fee, and rejected his request to strike the DNA fee in light of Ramirez. Id.

Here, Tavares points to a document attached to his judgment and sentence that lists his criminal history. The document, dated May 16, 2017, states that Tavares's DNA was taken. However, it is unclear whether his DNA was taken as a result of his prior convictions, or in relation to the current case. The date of his most recent prior conviction was March 6, 2015. A document dated December 15, 2015 states that Tavares's DNA had not been taken. Accordingly, we remand to the trial court to determine whether Tavares's DNA was taken as a result of his prior conviction.

We affirm Tavares's conviction, but remand to the trial court to strike the criminal filing fee and reconsider the imposition of the DNA collection fee.

_Appelwick, C.J._

WE CONCUR:

_____     _____